# IN THE SUPREME COURT OF IOWA

No. 11–0445

Filed March 1, 2013

IN RE THE MARRIAGE OF RACHEL A. McDERMOTT
AND STEPHEN J. McDERMOTT

Upon the Petition of
**RACHEL A. McDERMOTT,**

Appellee,

And Concerning
**STEPHEN J. McDERMOTT,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley, Judge.

A spouse seeks further review of a court of appeals opinion modifying a decree of dissolution. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**

Jennifer A. Clemens-Conlon of Clemens, Walters, Conlon & Meyer, L.L.P., Dubuque, for appellant.

Susan M. Hess of Hammer, Simon & Jensen, P.C., Dubuque, for appellee.

**WIGGINS, Justice.**

In this case, we consider whether the district court's award of an equalization payment totaling over one million dollars in a divorce action was equitable, where most of the underlying assets were associated with a farming operation. We also consider the child support and attorney fees award. The court of appeals reduced the equalization payment to $250,000. The court of appeals did not alter the child support obligation regarding income and health insurance costs, but did modify the provision dealing with the children's extracurricular expenses. We granted further review.

We find the district court was correct in its calculation of the equalization payment, its order fixing the amount of child support, and its decision regarding the extracurricular activities. However, we agree with Stephen that he should be allowed to deduct one-half of the health insurance payments. As to attorney fees, we find that neither party should pay the other's appellate attorney fees. Therefore, we vacate the court of appeals decision and affirm the district court judgment as modified.

### I. Issues.

The issues on appeal are whether the district court's property distribution was equitable and whether the child support obligations were correct. Both parties ask for appellate attorney fees, so we will also address this issue.

### II. Standard of Review.

In this equity action involving the dissolution of a marriage, our review is de novo. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012); *see also* Iowa Code § 598.3 (2009); Iowa R. App. P. 6.907. Accordingly, we examine the entire record and adjudicate anew the issue

of the property distribution. *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us. *Schenkelberg*, 824 N.W.2d at 484; *see also* Iowa R. App. P. 6.904(3)(*g*). We will disturb the district court's " 'ruling only when there has been a failure to do equity.' " *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005) (quoting *In re Marriage of Romanelli*, 570 N.W.2d 761, 763 (Iowa 1997)).

### III.  Factual and Procedural Background.

Under our de novo review, we find the relevant facts to be as follows. On June 7, 1997, Stephen and Rachel McDermott married in Epworth. Stephen was thirty-three, and Rachel was twenty-two.

At the time of the marriage, Stephen lived and worked on the farm owned by his parents, Irwin and Joanell. This three-hundred-acre property, referred to as the Irwin farm, has been in the McDermott family since 1943. Stephen was also working on the adjacent farm, which totaled over two hundred acres and belonged to his uncle, Patrick McDermott. The McDermott family has owned Patrick's farm since 1888, making it a century farm. Stephen had premarital assets he valued at $657,885. These assets included bank accounts, real estate, vehicles, farm equipment, crops, and livestock.

Rachel is a physical therapist. She worked in that capacity prior to and, for a time, during the marriage. Rachel brought into the marriage a savings account containing approximately $34,808.

After their marriage, Stephen and Rachel lived on the Irwin farm. Rachel stopped working as a physical therapist when their first child was born in January 1999. The couple later had five more children. Rachel was their primary caregiver.

Stephen supported the family with income generated from the farming operation, which initially included raising hogs and cattle, as well as planting and harvesting crops. To maintain the operation, Stephen received assistance from his father, uncle, brother, and other relatives. None of the family members received compensation for their labor.

Stephen also obtained support from his family in the form of favorable purchase agreements. When his brother, Thomas, entered seminary school in 1992, Stephen received seven thousand bushels of corn, several thousand bales of straw, a herd of cattle, and a herd of swine. Stephen agreed to pay his brother for the farm products and livestock with no interest accumulating.

Additionally, Stephen's father and uncle allowed him to use their farm equipment and buildings. Stephen agreed to purchase the equipment and buildings, as he could afford to, for their value upon the date of his first use.

In 1998, Stephen's parents sold their farm to Stephen and Rachel for $200,000—half the farm's market value. The sale occurred with the consent of Stephen's siblings and the understanding Stephen would inherit nothing further from his parents. The biannual payment was set at $5000, with an interest rate of four percent. Stephen and Rachel paid off the balance and received a special warranty deed in January 2009.

In 2002, Stephen and Rachel purchased Patrick's farm for $100,000. The annual obligation was $10,000. Stephen and Rachel made two payments before Patrick passed away in 2004. At that time, Patrick's farm was worth approximately $427,000. In his will, Patrick

forgave Stephen and Rachel's outstanding debt on the farm. Stephen's aunt, Rita, paid the $45,050[1] inheritance tax due on Patrick's farm.

After returning to school and obtaining recertification, Rachel filed for divorce on July 9, 2009. At that time, the parties had a total net worth of approximately $2.5 million, most of which was attributable to the farmland acquired from the McDermott family.

In the dissolution proceedings, the parties stipulated to: (1) joint custody, with shared physical care of the children; (2) no alimony award; (3) attorney fees assigned to each party, with each paying half the court costs; (4) the value of certain assets; (5) the value of farm equipment owned by Stephen before the marriage; (6) provisions for the children's health insurance and medical expenses; and (7) the division of the dependency exemptions for the children on federal and state income tax returns. Issues not agreed to by the parties included: (1) the division of marital assets and debts, (2) tax consequences resulting from the decree, and (3) the amount of child support.

The district court determined Stephen's income is $55,000, while Rachel's earnings total $65,520. Accordingly, the court ordered Rachel to pay child support of $219 per month for the six children. The support payment decreases as children no longer qualify for support, ultimately amounting to only ninety dollars per month when the last child is eligible. She is also required to pay half the children's activities fees.

The district court subsequently filed an addendum to the dissolution decree. The court awarded Stephen sole ownership of

---

[1]In his brief, Stephen argues his aunt, Rita, paid $53,000 in inheritance taxes resulting from Patrick's bequest of his farm. However, the record reflects that the full amount of the inheritance taxes was $53,050, of which Rita actually paid only $45,050. Rita testified that Stephen paid $8000 of the inheritance taxes. The variance in the amount of taxes paid is not relevant to our final decision.

property, valued at $657,885, which the court previously divided between the parties. The court then distributed the marital property, awarding most of the property to Stephen and assigning all debts to Rachel. Stephen's share of the marital assets was in excess of $2.1 million, but Rachel's was less than $150,000. The court then ordered Stephen to make an equalization payment to Rachel for $1,087,716. The court calculated the equalization payment by dividing the value of the land, the crops, and the farm equipment in half. The court gave Stephen two options for making the equalization payment. First, he could pay equal installments for three years at $362,572 annually. Alternatively, he could make an initial payment of $500,000, and then pay the remaining balance of $587,716 over a five-year period, with annual installments of $117,543. Neither alternative required Stephen to pay interest on the equalization payment.

Stephen chose to make the equalization payment in three equal annual installments. On March 7, 2011, Rachel acknowledged receipt of Stephen's first payment for $362,572. On March 14, the district court denied Stephen's motion to enlarge, amend, or modify the judgment on the most significant issues.

Stephen appealed. The court of appeals modified the property division award by decreasing the equalization payment to $250,000. In reaching this decision, the court of appeals found the district court failed to consider the tax consequences of the property division, and thus, substantially overvalued the assets allocated to Stephen. Furthermore, the court of appeals found inequity would result from awarding Rachel the entire value of the property received from the McDermott family.

Rachel sought further review, which we granted.

**IV. Discussion.**

**A. Introduction.** Iowa is an equitable distribution state. *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). "In dissolution-of-marriage cases, marital property is to be divided equitably, considering the factors outlined in Iowa Code section 598.21[(5)]." *Id.* The factors applicable in this case include:

> *a.* The length of the marriage.
>
> *b.* The property brought to the marriage by each party.
>
> *c.* The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.
>
> *d.* The age and physical and emotional health of the parties.
>
> *e.* The contribution by one party to the education, training, or increased earning power of the other.
>
> *f.* The earning capacity of each party . . . .
>
> . . . .
>
> *i.* Other economic circumstances of each party . . . .
>
> *j.* The tax consequences to each party.
>
> . . . .
>
> *m.* Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21(5).

**B. Classification of Assets.** The district court's first task was to identify and value all the assets subject to division. *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). To identify divisible property, the district court looks for all marital assets that exist at the time of the divorce, with the exception of gifts and inheritances to one spouse.

*Schriner*, 695 N.W.2d at 496; *see also* Iowa Code § 598.21(6). Premarital property may be included in the divisible estate. *Schriner*, 695 N.W.2d at 496. The district court may assign varying weight to premarital property, but should not automatically award it to the spouse who owned the property prior to the marriage. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). As this court has recognized,

> Property brought into the marriage by a party is merely a factor to consider by the court, together with all other factors, in exercising its role as an architect of an equitable distribution of property at the end of the marriage.

*Id.* (citations and internal quotation marks omitted); *see also* Iowa Code § 598.21(5)(*b*).

> Regarding inherited property and gifts, the Code provides:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.

Iowa Code § 598.21(6). The donor's intent and the circumstances surrounding the inheritance or gift are the controlling factors used to determine whether inherited property is subject to division as marital property. *In re Marriage of Liebich*, 547 N.W.2d 844, 850 (Iowa Ct. App. 1996). The court of appeals has also previously applied these two factors to determine whether the donor intended a party "to be the sole recipient of the inherited property." *Id.* at 851.

Notwithstanding the classification of property as inherited or gifted, the court may still divide such an asset as marital property, where awarding the gift or inheritance to one spouse would be unjust. *See In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989). We consider

the following factors when deciding whether it would be inequitable to exempt a spouse's gift or inheritance from division:

> (1) contributions of the parties toward the property, its care, preservation or improvement[ ];
>
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
>
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
>
> (4) any special needs of either party;
>
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000) (citations and internal quotation marks omitted).

To value the property, we refer to the parties' stipulated value of most assets. The district court adopted those valuations. We refuse to disturb the district court's valuation of the assets included in the marital estate because it is within the range of permissible evidence. *Hansen*, 733 N.W.2d at 703.

Here, the district court concluded the Irwin and Patrick farms were marital assets, subject to distribution. The court of appeals concurred, finding the gifted and inherited farms transferred to Stephen and Rachel jointly as husband and wife. However, the court of appeals concluded it would be inequitable to award Rachel half the value of the gifted and inherited property because Stephen knows only farming and would be unable to support himself and the children without the farmland.

Stephen asserts it was unjust, inequitable, and unfair to include the farms and farm assets in the divisible marital estate. According to

Stephen, his receipt of the farming operation for well below market value constituted an inheritance or gift. He argues it was the donative intent of Irwin, Patrick, and the entire McDermott family for the farming operation to stay in the family and for Stephen to farm the land to support the family. Therefore, Stephen contends the trial court should have credited him for: (1) $200,000, which is the market value of the Irwin farm, less the amount Stephen and Rachel paid his parents; (2) $407,000, which is the value of Patrick's farm, less the $20,000 Stephen and Rachel paid before his uncle died; (3) $45,050 for the inheritance taxes Stephen's aunt paid on Patrick's farm; (4) the undefined value of equipment and buildings owned by Stephen's brother and father; and (5) $780,000 for Irwin and Patrick's unpaid labor during the marriage.

The court of appeals has rejected similar arguments. In one case, a husband argued that $582,328 of the marital assets came from livestock, crops, machinery, rent reduction, use of certain equipment, and wages given to him by his family. *In re Marriage of Miller*, 552 N.W.2d 460, 463 (Iowa Ct. App. 1996). He also argued the court should take the value of these gifts out of the property distribution and award them to him. *Id.* The court rejected this argument and concluded these gratuitous transfers did "not truly represent gifts, or gifts to [the husband] alone. No gift taxes were paid in any of the years in which the alleged gifts were made." *Id.* Furthermore, the court held that even if the gratuitous transfers were gifts, the record lacked evidence showing the husband was the sole recipient. *Id.* Thus, the court properly classified them as marital assets. *Id.*

Another decision involved a husband who unsuccessfully argued his parents' forgiveness of a $29,000 loan for a down payment on the marital home was "an advancement on his inheritance." *In re Marriage of*

*Byall*, 353 N.W.2d 103, 105 (Iowa Ct. App. 1984). In classifying the $29,000 as a gift to both spouses, the court stated:

> We recognize that it is unlikely that [the wife] would have received the gifts had she not been married to [her husband], that the gifts were motivated by estate tax considerations, and that [the husband's] inheritance may be reduced by the gifts made to himself and [his wife]. We do *not* find, however, that the trial court's refusal, under these circumstances, to credit the entire amount of the gifts from [the husband's] parents to [the husband], was inequitable. We reject [the husband's] argument that the trial court's treatment of the parental gifts was inequitable.

*Id.* at 106.

Adopting this analytical framework, the record here does not show the donations by Irwin, Patrick, and Thomas of farm equipment, buildings, and unpaid labor constituted gifts. There is nothing in the record to indicate gift taxes were paid during the years of these alleged gifts. *See Miller*, 552 N.W.2d at 463. Furthermore, the evidence suggests the value of this generosity was intended to inure to the family, not to Stephen alone. Consequently, Stephen does not persuade us that he should receive credit for the gratuitous use of these buildings, goods, and services.

We also reject Stephen's argument that the property transfers were an advancement of his inheritance. The record reflects that Irwin and Joanell sold their farm to Stephen and Rachel for $200,000, half its market value. To support his claim that this generous transfer constituted an advancement on his inheritance, Stephen points to Irwin's testimony, which indicates Irwin did not intend for Rachel to "receive the benefit of [his] generosity individually as a single person, and not as a spouse of Ste[phen]."

This testimony does not establish that the $200,000 difference between the sale price and the market value of the Irwin farm constituted

a gift to Stephen individually. Rather, it supports Rachel's claim that the property transferred to both parties jointly as husband and wife, albeit with the expectation they would not divorce. Rachel's position is further supported by the terms of the 1998 real estate contract, which transfers the Irwin farm to "Stephen J. McDermott and Rachel A. McDermott, husband and wife as joint tenants with full rights of survivorship and not as tenants in common."

Similarly, Patrick's will clearly bequeathed the balance owed on the real estate contract to both Stephen and Rachel. Article II of Patrick's will states:

> If, at the time of my death, there is owed to me a sum of money under a real estate contract that I entered into on November 19, 2002, between, as a seller, and *Stephen J. McDermott and Rachel A. McDermott, husband and wife*, as joint tenants with full rights of survivorship and not as tenants in common, as buyers, said real estate contract having been recorded on November 19, 2002, in the office of the Recorder for Dubuque County, Iowa, as Instrument No. 22265–02, and if at the time of my death, there is still a balance unpaid to me under the terms and conditions of that real estate contract, then *I give to Stephen J. McDermott and Rachel A. McDermott*, or the survivor of them if one is deceased, any balance owed to me under the terms of that real estate contract, and said real estate contract shall be considered paid in full as a result of this bequest.

(Emphasis added.)

Well-settled principles guide our interpretation of wills:

> (1) the intent of the testator is the polestar and must prevail; (2) this intent, however, must be derived from (a) all of the language contained within the four corners of the will, (b) the scheme of distribution, (c) the surrounding circumstances at the time of the will's execution and (d) the existing facts; (3) we resort to technical rules or canons of construction only when the will is ambiguous or conflicting or the testator's intent is uncertain. In determining intent, the question is not what the testator meant to say, but rather what is the meaning of what the testator did say.

*In re Estate of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991) (citation omitted). As the express terms in his will indicate, Patrick clearly intended to forgive both Stephen and Rachel of the debt owed on the farm—not to make a gift to Stephen individually.

Irwin testified that when Patrick died, Stephen did not inherit under Patrick's will, because the transfer of Patrick's farm to Stephen constituted the entirety of his inheritance. Irwin further testified that the sale of the Irwin farm to Stephen at a price below market value was an advance on his inheritance. Stephen's brother, Thomas, confirmed there was an understanding between Irwin and Joanell and their children that the transfer of the Irwin farm to Stephen on exceedingly generous terms would constitute the entirety of Stephen's inheritance. Thomas explained that the siblings understood this would result in Stephen receiving a much larger share of Irwin and Patrick's respective estates. However, the family justified this disparity by the fact that Stephen would farm the land to provide for his family and then pass the property to the next generation of McDermotts.

This testimony suggests the donative intent of Irwin, Joanell, and Patrick was to provide Stephen, in advance, with his share of the McDermott family inheritance. To support this conclusion, we turn to *In re Marriage of Johnson*, 455 N.W.2d 281 (Iowa Ct. App. 1990). In that case, a husband and wife contracted to buy a one-hundred-sixty-acre farm from the wife's mother. *Johnson*, 455 N.W.2d at 282. When the mother died, the estate forgave the outstanding balance of over $91,000. *Id.* On appeal from the dissolution proceedings, the court of appeals held that "$90,000 of the 160-acre farm w[as] the inherited property of [the wife]" and "must be taken out of the marital property bin and placed exclusively with" her. *Id.* at 283. However, the *Johnson* decision is silent

on the specific terms of the mother's will and does not indicate whether the will mentioned both parties, or only the wife, when forgiving the contract balance. Here, the record is clear that Patrick's will specifically identified both spouses as beneficiaries.

Furthermore, Stephen's aunt, Rita, testified that when Patrick drafted his will, their attorney briefly discussed the potential consequences of forgiving the balance owed on the contract if Stephen and Rachel divorced. According to Rita, Patrick disregarded this risk, based upon his complete trust the couple would stay together forever. The attorney, Douglas Pearce, confirmed this in his testimony. Based on this evidence, Patrick intentionally made a joint bequest. Patrick's belief that the parties would never divorce does not change the bequest's character.

The record also demonstrates that the transfer of the McDermott farms to Stephen and Rachel constituted the entirety of Stephen's inheritance. However, like the court of appeals in *Byall*, we believe Stephen and Rachel received the gifts jointly as husband and wife. 353 N.W.2d at 106. Therefore, we refuse to identify as Stephen's separate property the $200,000 difference between the sale price and market value of the Irwin farm, and the $387,000 debt, which Patrick forgave in his will. Similarly, the $45,050 Stephen's aunt paid to cover the inheritance taxes resulting from Patrick's bequest was at best a gift to both parties. Nonetheless, as in *Miller*, no gift taxes were paid in 2004, the year of the alleged gift. 552 N.W.2d at 463. Even if we classify Rita's payment of the inheritance taxes as a gift, there is no evidence she intended only Stephen to benefit therefrom. Rita testified that she made the payment so Stephen *and* Rachel would not have to pay the taxes.

We find the gifted or inherited property identified by Stephen was neither a gift nor inheritance to him alone. Instead, it transferred to Stephen and Rachel jointly. Therefore, the value of this property was properly included in the marital estate, and we need not apply the equitable factors to determine whether it would be unjust to exclude from the marital estate property gifted to one spouse. *See In re Marriage of Thomas*, 319 N.W.2d 209, 211 (Iowa 1982).

We have also reviewed the other valuations, marital property determinations, and nonmarital property determinations made by the district court. We find the district court properly classified and valued the property. Accordingly, we will not disturb the district court's findings.

**C. Distribution of Marital Assets and Debts.** We now turn to the distribution of the marital assets. "An equitable distribution of marital property, based upon the factors in 598.21(5), does not require an equal division of assets." *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013). Equality is, however, often most equitable; therefore, we have repeatedly insisted upon the equal or nearly equal division of marital assets. *Id.*

To achieve an equitable division, we apply the factors contained in section 598.21(5), keeping in mind there are no hard and fast rules governing economic issues in dissolution actions. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). Because precedent is of little value when framing a distribution, our decision must ultimately depend on the particular facts relevant to each case. *Id.*

As the district court determined and we affirm, the farmland and some of the farm equipment is marital property. The Code requires the court to divide marital property between the parties. Iowa Code

§ 598.21(1). Nonetheless, Stephen testified that he wanted to continue to farm the land and keep it in his family. Rachel agrees Stephen should continue to farm the land but wants her fair share of the assets. Here, however, there is no cash or other liquid asset to award Rachel to offset the farmland and other farm assets Stephen wants to retain. Thus, the court required Stephen to make an equalization payment.

An equalization payment is preferable when the court cannot divide an asset easily and there are not enough liquid assets in the marital estate to achieve an equitable distribution. The easiest way for a court to divide property is to order the parties to sell the land and split the proceeds. In that instance, each party is then responsible for any tax consequences arising from the sale. However, a forced sale is not a preferable method to divide marital assets, because such a sale tends to bring lower prices, and, as in this case, a party usually wants to keep the property rather than sell it.

Additionally, our precedent acknowledges the public policy in favor of preserving family farming operations:

> We have previously recognized the reasonableness of a trial court awarding a farm to the spouse who operated it and in fixing the awards and schedule of payments to the other spouse without reaching *equality* so the farmer-spouse might retain ownership of the farm.

*In re Marriage of Callenius*, 309 N.W.2d 510, 515 (Iowa 1981) (*citing In re Marriage of Andersen*, 243 N.W.2d 562, 564 (Iowa 1976)) (emphasis added); *see also In re Marriage of Briggs*, 225 N.W.2d 911, 913 (Iowa 1975). We find such a consideration particularly relevant in this case. *See* Iowa Code § 598.21(5)(*m*) (allowing the court to consider other relevant factors when dividing assets). Thus, when one of the parties

expresses a strong interest in preserving the farm, the court should do everything possible to respect that desire.

However, a party's interest in preserving the farm should not work to the detriment of the other spouse in determining an *equitable* settlement. We find the division of marital property in nearly equal shares is equitable under all the factors listed in Iowa Code section 598.21(5). One factor supporting our conclusion, as well as the district court's decision, is that Stephen will receive nonmarital assets that he valued in his exhibit at $657,885. *See id.* 598.21(5)(*b*) (determining an equitable property settlement involves consideration of "[t]he property brought to the marriage by each party").

Stephen argues such a property settlement is unfair. To make the equalization payments, the dissolution decree forces him to take a mortgage on the property. He further alleges that the farming operation's cash flow cannot support the mortgage payments. In order to avoid this inequity, he argues the farm should be valued in light of the tax consequences he will incur upon selling the farmland.

The district court considered this argument and rejected it. So do we. In making its award, the district court must have believed the property would generate sufficient cash flow to allow Stephen both to make the necessary mortgage payments and to satisfy the equalization payment. Our review of the record confirms this fact. First, Stephen investigated the possibility of taking out a mortgage on the farmland for fifty percent of its value. The bank told Stephen it would make the loan, based upon the information supplied by Stephen. We must assume a bank would not make a loan if the borrower did not have the resources to repay the loan.

Second, Stephen's tax returns show a number of deductions that do not affect his cash flow. Depreciation is an example of one such deduction. Moreover, Stephen and his accountant met and made spending decisions to avoid income taxes. By spending money to avoid income tax liability, Stephen artificially lowered his cash flow. Third, any mortgage payment is deductible against any income tax liability. Finally, experience shows the farms generate substantial cash flow. Stephen paid off the debt to his parents for the Irwin farm nine years early, while at the same time making two payments on the Patrick farm.

Considering all of this, we agree with the district court's findings that Stephen has the ability to borrow against the farm property and make the equalization payment, without taking into consideration the tax consequences of any future sale of the farmland.

This area of law is well settled. The Code requires us to consider the tax consequences in making a property settlement. *Id.* § 598.21(5)(*j*). We have interpreted this section to mean "where there is no evidence to support a discounting based on a sale and the trial court has not ordered a sale, the effect of considering income tax consequences on a sale" diminishes the value of the asset to the nonowning spouse. *In re Marriage of Friedman*, 466 N.W.2d 689, 691 (Iowa 1991). Thus, if the court orders the sale of an asset, the court may consider the tax consequences of the sale in making its property settlement. The court of appeals has held that where a spouse makes a court-ordered, lump-sum payment of cash to the other spouse that will, in all probability, require the liquidation of capital assets, consideration of the tax consequences is appropriate in making an award. *In re Marriage of Hogeland*, 448 N.W.2d 678, 680–81 (Iowa Ct. App. 1989). Here, the court did not require the sale of the farmland. The record further supports the district court's

finding that Stephen did not intend to sell the property and that he had the financial ability to take a mortgage out on the property to pay the equalization payment. Therefore, we affirm the district court's property distribution.

**D. Child Support Obligations.** The purpose of the child support guidelines is to provide for the best interests of the children after consideration of each parent's proportional income. *In re Marriage of Beecher*, 582 N.W.2d 510, 513 (Iowa 1998). Our legislature has established a rebuttable presumption that our child support guidelines yield the proper amount of monthly support. Iowa Code § 598.21B(2)(*c*); *see also In re Marriage of Powell*, 474 N.W.2d 531, 533 (Iowa 1991). The court may not deviate from the amount of the child support yielded by the guidelines "without a written finding that the guidelines would be unjust or inappropriate under specific criteria." *Powell*, 474 N.W.2d at 533.

Here, the district court accepted the parties' stipulation to joint physical care of their six children. Therefore, both parents have an equal responsibility to maintain homes and provide routine care, with neither party having superior rights or responsibilities with respect to the children. *See* Iowa Code § 598.1(4). In Iowa, we use the offset method for calculating child support in cases involving joint physical care. *In re Seay*, 746 N.W.2d 833, 835 (Iowa 2008) (citing Iowa Ct. R. 9.14). "The rule reflects the difference between joint physical care and other parental arrangements." *Id.* The offset approach requires the court to calculate the amount each party would be required to pay if they were a noncustodial parent and then base the child support upon the difference between those two amounts. *Id.* at 834.

Stephen first complains the district court included a one-time gain in 2008 of $9176 from the sale of timber when it calculated his income for the purposes of applying the child support guidelines. Thus, he argues his income for his child support, as calculated by the district court using the offset method, was higher than it should have been. We disagree.

In determining Stephen's income for the purposes of applying the guidelines, the court did not adjust his section 179 depreciation expenses that averaged $11,204 per year. For purposes of determining child support, we have previously recalculated the deduction for section 179 depreciation under a straight line method. *In re Marriage of Gaer*, 476 N.W.2d 324, 329 (Iowa 1991). We reaffirmed this principle in *In re Marriage of Knickerbocker*, 601 N.W.2d 48, 52 (Iowa 1999), holding "it was proper for the court of appeals to recalculate depreciation of [the husband's] personal property farming assets under a straight line method of depreciation in order to do justice between the parties." Therefore, under these circumstances, where the district court added funds from a one-time timber sale to Stephen's income, but not the more substantial sum by adjusting his annual section 179 depreciations, even though the district court could have, we find the evidence supports and equity favors the district court's determination of Stephen's annual income for purposes of applying the guidelines.

Second, the district court also ordered Rachel to maintain health insurance for the children, but awarded her a deduction for that expense. However, in the parties' pretrial stipulation, which the district court adopted, the parties agreed to share the cost of the children's health insurance equally, with Stephen issuing a monthly payment to Rachel for one-half the cost.

The district court ruling grants Rachel a windfall by allowing her to deduct the cost of the children's health insurance and collect one-half the health insurance from Stephen monthly. Pursuant to the pretrial stipulation adopted by the district court, Stephen should be required to reimburse Rachel one-half the cost of insurance on a monthly basis and both parties should receive a deduction for one-half the cost of the children's health insurance under the child support guidelines.

Finally, Stephen contends the district court erred in allocating the children's extracurricular activity expenses. The district court found "Stephen is more of a saver than Rachel as he does not believe in many extra-curricular activities, and the Court is convinced he will not pay any share of these types of expenses if he deems the activity to be frivolous." The district court explicitly addressed Stephen's viewpoint when constructing its child support order. The court ordered that "[e]xtracurricular activity fees will be divided in half and not unreasonably withheld due to the parents' likes or dislikes about the activity." The court also ordered "the parties shall split the cost equally for any activity or school[-]related fees, dues or athletic activities, and each party shall provide an accounting to the other party on a monthly basis of expenses to be reimbursed." By doing so, Stephen argues the district court improperly deviated from the child support guidelines. He contends that each parent should have the discretion to pay for the extracurricular activities that he or she elects to support.

The child support guidelines are designed to calculate an amount of funds that will "cover the normal and reasonable costs of supporting a child." *In re Marriage of Okland*, 699 N.W.2d 260, 268 (Iowa 2005); *see also* Iowa Ct. R. 9.3 (recognizing the guidelines "will normally provide reasonable support"). In fact, there is a presumption the guidelines will

yield a support amount that will "encompass the normal needs of a child, except for medical support and postsecondary education expenses." *Okland*, 699 N.W.2d at 268.

We have already addressed the permissibility of deviating from the child support guidelines to accommodate expenses from children's extracurricular activities. *Id.* at 268–69. However, our precedent only addresses the award of such funds when one parent has sole custody of the children and the other parent's responsibility is limited to paying child support payments, not the children's additional expenses. In *Okland*, where the court awarded sole custody to the husband, we considered whether it was proper for the court to award additional support, requiring the parties to share expenses for "school-related activities, extracurricular activities, clothes, and automobiles." *Id.* at 269. We said it was improper to deviate from the child support guidelines because these were not unique child expenses and the guidelines contemplated such costs when one parent has sole custody of the children. *Id.*

The extracurricular activity expenses, school-related fees, and dues for athletic activities addressed by the district court fall squarely within the realm of childrearing expenses contemplated by our guidelines. Thus, if the court awards sole custody, an application of the guidelines necessarily factors these expenses into the child support determination. *Id.* at 269 (citing *In re Arabian*, 855 A.2d 560, 562 (N.H. 2004) (" ' "Extracurricular activities fall into the same category of basic support as food, shelter and recreation" . . . [and] are included in the parties' total support obligation.' " (Citations omitted.)). The activities for which the district court ordered additional support are not "unique to the lives of children, and the record in this case reveals no evidence that the

expenses of these children were significantly different than normally incurred by other children of their age." *Id.*; *see also In re Marriage of Fite*, 485 N.W.2d 662, 664–65 (Iowa 1992) (holding the child's attendance at a parochial school did not provide a basis for increasing the support level above the guidelines); *In re Marriage of Gordon*, 540 N.W.2d 289, 292 (Iowa Ct. App. 1995) ("[E]xpenses for clothes, school supplies and recreation activities are considered under the guidelines, and a separate support order covering such expenses is improper absent a finding that the guidelines amount would be unjust or inappropriate."). Therefore, deviation from the guidelines was not necessary to avoid injustice in a case where the court awards physical custody to one spouse. *See Powell*, 474 N.W.2d at 533.

Here, the court awarded *both* parties physical custody of the children. In calculating the child support obligation, the court used the offset method. In other words, the court established the child support obligation based upon what each party should pay for the children's support. By doing this, the support payment calculation already includes the extracurricular fees. Because both parties are paying support under the offset method and both have an obligation to cover the children's expenses, the court was justified in requiring each party to pay one-half the extracurricular expenses to make sure both spouses pay their fair share.

Therefore, we affirm the district court's award of child support and the requirement that each party pay one-half the children's extracurricular expenses. However, we remand the case for the district court to enter the appropriate order, giving Stephen a deduction for one-half the health insurance benefits he pays, as long as he is current in that obligation.

**E. Attorney Fees.** Both parties request an award of appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *Okland*, 699 N.W.2d at 270. In determining whether to award appellate attorney fees, we consider " 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.' " *Id.* (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). After carefully considering each of these factors, we find neither party is entitled to an award of attorney fees in this appeal. Both parties have the ability to pay their own attorney fees. *See Sullins*, 715 N.W.2d at 255.

**V. Conclusion.**

We vacate the decision of the court of appeals. We affirm the district court's property distribution, including the equalization payment to Rachel. We also affirm the district court's award of child support and the requirement that each party pay one-half the children's extracurricular expenses. However, we remand the case for the district court to enter the appropriate order giving Stephen a deduction for one-half the health insurance benefits he pays, as long as he is current in that obligation. Costs of this action are taxed to Stephen.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**

All justices concur except Appel and Hecht, JJ., who dissent.

#11–0445, *In re Marriage of McDermott*

**APPEL, Justice (dissenting).**

I respectfully dissent. The result embraced by the majority forces Stephen to face Hobson's choices that will produce an inequitable result in this case.

The end result of the majority in this case is that Rachel, who entered the twelve-year marriage with assets of $34,808, will leave the marriage with a significant increase in her earning capacity because of education and training she obtained during the course of the marriage and an unencumbered award of $1,087,716. Stephen, on the other hand, will be left with a substantially impaired earning ability and assets carrying a substantial tax liability. This inequity is demonstrated by an exploration of the available options to Stephen to meet the $1,087,716 equalization payment imposed by the majority's property division.

First, Stephen can simply sell the family farm, pay Rachel $1,087,716, and keep the balance for himself. There are two problems with this option. First, if he chooses this option, all the taxes and transaction costs will be borne by Stephen. It was undisputed at trial that the tax and transaction costs associated with sale of the farmland would approach thirty percent of its property value. Clearly, it would be inequitable for Stephen to bear the entire amount of the transactions costs to meet the obligation of the divorce decree. *See* Iowa Code § 598.21(5)(*i*)–(*j*) (2009) (specifically directing the court to take into account the "economic circumstances" and "[t]he tax consequences to each party"); *see also In re Marriage of Hoak*, 364 N.W.2d 185, 194 (Iowa 1985) (considering the tax burden to one party in dividing stock during divorce proceeding); *In re Marriage of Pittman*, 346 N.W.2d 33, 36 (Iowa 1984) (affirming district court's equitable division of marital assets where

the court properly "considered that if [the divorced wife] sold the house a 7 percent realtor's fee must be deducted from the net equity"); *In re Marriage of Hogeland*, 448 N.W.2d 678, 680–81 (Iowa Ct. App. 1989) ("[W]here . . . the payment of a lump sum of cash to a spouse will in all probability require the liquidation of capital assets, the income tax consequences of such a sale should be considered by the trial court . . . ."); *cf. In re Marriage of Hardy*, 539 N.W.2d 729, 732 (Iowa Ct. App. 1995) (reducing district court's alimony award where the evidence demonstrated divorced husband's income was insufficient to make payment, additional borrowing was not possible, and liquidation of farm assets would "decrease his income and result in considerable income tax consequences").

Second, instead of complete liquidation, Stephen could sell a large enough portion of the family farm to meet the obligation imposed by the majority. If he chooses this option, he will still be forced to bear tax and transaction costs, although the inequity would be less than that which would result from complete liquidation of the farm. In addition, however, liquidation of substantial farmland cannot help but impact the economic viability of the family farm. By reducing economies of scale as well as the land in production, the sale of substantial farm assets will significantly impair Stephen's ability to earn a living.

The trial court found that the farm operation during the course of the marriage netted Stephen and Rachel approximately $55,000 per year. If Stephen is required to sell substantial farm assets, it is a virtual certainty that Stephen's income from operating the family farm, assuming it remained economically viable after the sale of major assets, would significantly decline. This result flies in the face of our caselaw, which indicates that maintaining the life style of the participants of a

marriage, to the extent possible, is a goal of property distribution. *See In re Marriage of Goodwin*, 606 N.W.2d 315, 319–20 (Iowa 2000) (explaining that gifted and inherited property should be divided when necessary to allow each party to maintain an increased standard of living that occurred during the marriage); *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989) (same); *In re Marriage of Steenhoek*, 305 N.W.2d 448, 454 (Iowa 1981) (listing maintenance of standard of living as one of the relevant considerations in the property distribution determination); *see also* Iowa Code § 598.21(5)(*f*) (directing the court to consider the ability of each party to "become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage").

This significant decline in Stephen's income if he sells substantial farm assets will occur at a time when the income of Rachel, his spouse, will dramatically increase. During the marriage, Stephen supported Rachel's effort to obtain additional education in order to obtain licensure as a physical therapist. She now earns $65,520 per year. Stephen's yearly income of $55,000 from farm operations will in all likelihood significantly decline due to the steps he is forced to take to meet the equalization payment in this case.

A third option for Stephen is to mortgage the family farm and attempt to continue farming operations. Assuming Stephen obtains a $1,087,716 loan, he will have substantial yearly service obligations. The service obligations will lead to a decrease in farm income for Stephen. Thus, as with the land sale approach, Stephen's ability to earn income from the family farm operation will decline as a result of the divorce, while Rachel's ability to earn income will materially increase.

A fourth option might be to mortgage the farmland and rent it out to a third party. Under this option, the rental income might be sufficient

to service the loan required to meet the $1,087,716 obligation from the district court's divorce decree. Under this scenario, of course, Stephen would no longer be farming the land and would need to earn income in an off-the-farm job. He has only a high school education and is unskilled, however, and there is no substantial likelihood that Stephen could earn $55,000 in an off-the-farm job.

In effect, what the majority has done is force Stephen to sell the family farm in its entirety and assume an inequitable share of transaction costs or, in the alternative, pursue options other than sale of assets which will almost certainly decrease his ability to maintain his standard of living while the lifestyle of his former spouse increases. Both results are contrary to our caselaw. The harsh Hobson's choice faced by Stephen requires some adjustment to the trial court's award.

Further, the majority places no value in preservation of the family farm as an ongoing enterprise. Our caselaw is to the contrary. In *In re Marriage of Callenius*, 309 N.W.2d 510, 515 (Iowa 1981), we upheld an award that did not reach equality where farmland was the principle asset of the parties, where one spouse's vocation was farming, and where that spouse brought considerable farm assets into the marriage. We endorsed the reasonableness of court orders "awarding a farm to the spouse who operated it and in fixing the awards and schedule of payments to the other spouse without reaching equality so the farmer-spouse might retain ownership of the farm." *Callenius*, 309 N.W.2d at 515. Under the teaching of *Callenius*, the maintenance of the family farm as a viable entity is a factor to consider in making an equitable award, even if the result is that the division of assets is not equal.

I disagree, however, with certain assertions made by Stephen. In particular, like the majority, I disagree with Stephen's assertion that

because Rachel did not participate directly in farming operations, she should not be considered an equal participant in the marriage. She was primarily responsible for raising six children, and no one disputes that she worked hard as part of the family unit even though she did not generate outside income. The suggestion that Rachel was not an equal partner in the marriage based upon the allocation of family responsibilities cuts nothing but air. *See In re Marriage of Briggs*, 225 N.W.2d 911, 913 (Iowa 1975) ("Husband and wife need not, during happy days, keep a ledger to prove his or her economic value should the marriage later founder."). While I reject this overreach, Stephen should not be penalized in the property distribution because he made a completely unpersuasive argument.

It seems to me at the end of the day, there are several propositions that the majority does not dispute.

1. Rachel's postdivorce earning ability, based in part upon education obtained during the marriage, is $65,520 per annum as a physical therapist.

2. Stephen's earning ability arising from his farming operations of $55,000 per year during the marriage cannot help but be adversely affected by the steps he is forced to take as a result of the equalization payment required by the court.

3. Rachel will have an unencumbered asset of $1,087,716, while the farm land retained by Stephen is subject to a major tax encumbrance.

4. Rachel's future economic prospects are improved by the dissolution, while Stephen's future economic prospects are impaired.

The majority finds these results equitable. I do not.

In the end, establishing an appropriate property division in this case is a matter of art rather than science. While I reject the award of $1,087,716 by the majority as inconsistent with the thrust of our caselaw and too onerous on Stephen, I also reject the relatively low award of $250,000 by the court of appeals. In my view, based on the totality of equities, I would award Rachel $600,000 to be paid by Stephen over a ten-year period in equal installments. This result will avoid the potential tax inequities and will give Stephen a better chance of continuing as an independent farm operator, while at the same time providing Rachel with a substantial share of marital assets. As it stands now, Rachel will have the financial ability to have a much improved standard of living as a result of the dissolution, while Stephen's ability to generate income will be substantially reduced.

Hecht, J., joins this dissent.