# IN THE COURT OF APPEALS OF IOWA

No. 24-1332
Filed June 18, 2025

IN RE THE MARRIAGE OF LINNETTE SONDGEROTH
AND ROBERT SONDGEROTH

Upon the Petition of
**LINNETTE SONDGEROTH,**
       Petitioner-Appellant,

**And Concerning**
**ROBERT SONDGEROTH,**
       Respondent-Appellee.
_____

Appeal from the Iowa District Court for Greene County, Kurt J. Stoebe,

Judge.

Linnette Sondgeroth appeals from the decree dissolving her marriage.

**AFFIRMED AS MODIFIED.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

Vicki R. Copeland of Copeland Law Firm, P.L.L.C., Jefferson, for appellee.

Considered without oral argument by Greer, P.J., and Langholz and

Sandy, JJ.

**GREER, Presiding Judge.**

Challenging only the property-division and attorney-fee provisions of the decree dissolving her marriage to Robert Sondgeroth, Linnette Sondgeroth appeals. Her central focus is to regain the inheritance monies she received in 2012 as a part of the property division. Linnette also argues that the district court abused its discretion when it did not order Robert to pay her trial attorney fees. Finally, she asks this court to order Robert to pay her appellate attorney fees.

On our review, we conclude that the district court did not abuse its discretion by rejecting Linnette's request for trial attorney fees. Likewise, we do not award her any appellate attorney fees. As for the property division, we affirm the dissolution decree as modified.

## I.     Background Facts and Proceedings.

Linnette and Robert married in 1997, when they were both about forty-nine years old. At the time of the marriage, both had children from prior relationships. The parties separated around July 2023.

During the marriage, Linnette worked as custodial staff for the local county courthouse, and Robert worked as a self-employed carpenter. Linnette retired in 2014 and began to collect her IPERS[1] pension of $706 per month, which was earned during the marriage. At the time of the dissolution trial in June 2024, she was also receiving social security benefits of $1079 per month. Sometime in 2020, Robert retired from carpentry work, but he was still working at a hardware store earning about $2500 per year at the time of trial. At that time, monthly benefits

---

[1] IPERS stands for Iowa Public Employees' Retirement System.

available to him were his Department of Veterans Affairs (VA) monthly disability benefit of $1514 and his social security benefit payment of $1560.

The parties each owned homes that they sold after they married; Robert's sold for around $46,000 and Linnette's for about $20,000. In 2006, they bought an acreage for $80,000 from Robert's friend, who gave them a fifty percent discount according to Robert. Linnette acknowledged it was a good deal.

In 2012, Linnette inherited $259,041.90 from her father's estate. She deposited $159,041.90 into a joint account with Robert and put the remaining $100,000 in a separate account—both at the same bank. Other than the initial deposit slip, no records were produced related to any account holding the $100,000.

The parties provided unclear and sometimes contradictory testimony about the use of the funds after Linnette inherited and divided them. Robert testified that Linnette told him she converted the $100,000 to cash and kept it in a safe that her sister had. Yet, from that $100,000, Linnette testified that she paid off the acreage's mortgage note of about $30,000, the motor home note of $10,000, and the van note for Linnette's son in the amount of $32,000. As for the funds in the joint account, which included the inherited $159,041.90, Linnette and Robert used some of the funds to improve the acreage by replacing the roof ($15,000-$20,000) and building a garage ($10,000). Robert provided the labor for these improvements.

Without dispute, the inherited funds also went to help out Linnette's children. In 2013, Linnette gave each of her three children $10,000. And Robert remodeled each of Linnette's children's homes, spending between $10,000 and $15,000 of

the inherited funds for building materials and providing free labor for each project. Linnette helped pay medical bills for one of her grandchildren who had been diagnosed with leukemia, expending around $18,000. And she paid for flights for her family, six people at a time, three to four times.

During the marriage, Linnette and Robert also used the inherited funds for their joint benefit. They traveled to Branson, Missouri, nine times and spent about $2500 each trip. Even so, the couple did not live an extravagant lifestyle.

In 2020, they decided to downsize and sell their acreage. Because Robert also decided to mostly retire, he sold his work equipment for $32,000 and used $15,000 of the proceeds to purchase a camper in Florida, which came out of the couple's joint account.

After selling the acreage, Linnette and Robert did not purchase a new residence and instead opted to move into a rental apartment. They put the proceeds of the 2020 acreage sale, $268,442.70, into their joint account. Linnette then withdrew $100,000 and moved it to a separate account. She withdrew $90,000 from that separate account to purchase two annuities. Robert asserted Linnette also withdrew an additional $30,000, which was not accounted for during trial.

In 2023, Linnette petitioned for dissolution. When she did not respond to Robert's discovery request, he filed a motion to compel to seek documentation supporting the inheritance expenditures. The district court granted that motion, but Linnette still did not produce the requested financial information. Robert filed another motion to compel, which the district court again granted, specifically requiring Linnette to "provide bank statements, canceled checks and deposit slips

for any checking and savings accounts from January 1, 2012 through the current, or any other documentation regarding the investment, deposit or disposition of any property or funds inherited by her." Again, Linnette did not produce the ordered documents.

Linnette and Robert were the only witnesses at the dissolution trial. In its ensuing dissolution decree, the district court characterized Linnette's testimony as "evasive." It also determined that her "failure to cooperate with discovery and her willful disobedience of [the] court's orders undermine[d] her credibility." Robert proposed he would either take half of the IPERS and cash of $35,000 or split the annuity and let her keep her IPERS. Linnette advocated that she keep all of her IPERS and her annuities. The district court awarded the parties their respective vehicles and any bank account solely in their names. It awarded Robert the trailer in Florida, a golf cart, and tractor trailer. It also ordered him to pay Linnette a $2750 property equalization payment. As for the two annuities, the court equally divided both between the parties. Finally, it divided Linnette's pension according to the *Benson* formula.[2]

---

[2] Pursuant to *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996), the value of the pension benefit is to be determined at the time of maturity using a formula where

> [a] fraction is first computed, the numerator being the number of years during the marriage [the spouse] accrued benefits under the pension plan . . . and the denominator being the total number of years [the spouse's] benefits accrued prior to maturity (*i.e.,* receipt of payments upon retirement). This fraction represents the percentage of [the spouse's] pension attributable to the parties' joint marital efforts. This figure is then multiplied by [the other spouse's] share of the marital assets (fifty percent). Finally[,] this second figure is multiplied by [the spouse's] total accrued monthly benefit upon maturity (retirement) to calculate [the other spouse's] share.

Linnette appeals, challenging the property division and the district court's determination that both parties should pay their own attorney fees.

**II.     Standard of Review.**

"An appeal regarding the dissolution of marriage is an equitable proceeding." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015); *see also* Iowa Code § 598.3 (2023). We review equitable proceedings de novo. *Gust*, 858 N.W.2d at 406. And applying de novo review means "[w]e review the facts and law, and adjudicate once again those issues properly preserved and presented." *In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995). However, we will only disturb the district court's ruling when it has failed to do equity. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

And we review the district court's decision to grant or deny a request for trial attorney fees for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

**III.    Discussion.**

**A.     Property Division.**

***Inherited Funds.*** Linnette's main contention is that the district court's division of property is inequitable because it failed to set aside the $100,000 she removed from the joint account and put towards her annuities to replace part of her 2012 inheritance. She also contends that the district court erroneously concluded she was "hiding" inherited money. She argues she regained her inherited funds by purchasing the two annuities, so they should not be subject to division, and that there is no evidence that she held back any monies not disclosed.

The district court was frustrated by the lack of detail Linnette provided to substantiate her requests related to the property division, describing her assets as "largely unknown." The court noted that "[t]o further aggravate the situation and demonstrate her obstinance, Linnette gave evasive answers on cross examination about the existence of bank accounts and the disposition of her inherited funds." And on our review, the money trail is difficult to reconstruct as the testimony was confusing and the account statements submitted only told part of the story. The copy of the joint savings account with Linnette's handwritten notes about the withdrawals confirmed expenditures related to the $159,041.90 inheritance payment, but there was no documentation of history related to the $100,000 payment that was placed elsewhere.

While the district court had no information in this record to do so, we generally examine several factors to determine if it is equitable to divide an inheritance in dissolution proceedings. *See McDermott*, 827 N.W.2d at 679. Those factors include:

> (1) contributions of the parties toward the property, its care, preservation or improvement[];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*Id.* (citation omitted). And generally, gifted and inherited property is not divisible unless failure to do so would be inequitable to the other party. Iowa Code

§ 598.21(6). Likewise, simply because the funds were commingled with joint funds is not controlling in deciding whether the property should be divided. *See In re Marriage of Liebich,* 547 N.W.2d 844, 851 (Iowa Ct. App.1996).

Here, the facts seem similar to those found in *In re Marriage of Fluent*, No. 16-1321, 2017 WL 2461601, at *3 (Iowa Ct. App. June 7, 2017). In *Fluent*, the inherited property was not set aside as non-marital because the husband "voluntarily used his inheritance for the benefit of himself and his family," "there [was] no indication that any amount of that money remain[ed]," the wife did not uniquely benefit from the inheritance, and the money was used "to maintain the parties' basic standard of living." *Id.* It was also compelling that the husband had asked for the value of the inheritance to be set aside as non-marital "without providing any accounting for the[] expenditures or identifying any asset (beyond the marital home) into which the monies were allegedly spent." *Id.* (footnote omitted). Even more, here, Linnette spent significant amounts of her inheritance on her own children and their families—a choice that extended the benefit of her father's monies beyond just Linnette to other family members. To now award her the monies she gifted to her family would not be equitable to Robert and would give Linnette the benefit of the inherited funds twice.

The record in this case is sparse, making it difficult to trace the funds through the years. We know that Linnette deposited $159,041.90 into the joint savings account in December 2012 and that there were few other deposits made between 2012 and the 2020 deposit of the home sale proceeds. But we do not know what the balance of the savings account was prior to that 2012 inheritance deposit. Yet, by December 2014, the withdrawals from the savings account

exceeded the amount Linnette deposited. Some of that money was spent on the acreage to add a garage and fix the roof, but we only have rough cost estimates for those improvements. Linnette used another roughly $10,000 to pay off a debt on a motor home.[3] We also know that Linnette placed $100,000 of her inheritance in a separate account, but we do not know what expenditures came out of that separate account aside from roughly $72,000 to pay off the motor home note, the acreage's mortgage note, and her son's van (assuming the money for the van came from this account); it is not clear if any funds remained in the account. Linnette spent a considerable amount of money on her children and their families (and Robert contributed to her sons by providing free labor for the construction work). The contributions to Linnette's family documented in the testimony conservatively exceeded $143,000 alone with many of the expenditures not delineated. Additionally, Linnette and Robert used monies for their personal travel. Working with the record that the parties provided us, we conclude that Linnette depleted her inheritance long ago.[4]

As to Linnette's contention that she used the $100,000 post-acreage-sale withdrawal to replace the $100,000 portion of her inheritance she initially set aside and claims she put towards joint assets, we do not credit her testimony as to how she spent the funds or if any still exist because we defer to the district court's

---

[3] They later sold the motor home for $3000.
[4] Both from Robert during trial and in the district court ruling, there were insinuations that Linnette had "hidden" at least $100,000. But Robert acknowledged the expenditures involving the funds that cut across any theme that a sum of money is hidden somewhere. Still, we note Robert's argument that Linnette has not explained what happened to the additional $30,000 removed from the savings account when the $100,000 was removed on June 23, 2020.

determination that her testimony was not credible. *See In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007). However, both parties agree that Linnette used a portion of that money to pay off the mortgage note on the acreage, estimating the balance to be about $30,000 when she paid it off. But we recognize Linnette was not the only one who contributed to the acreage; Robert put in considerable efforts to improve the acreage through his own sweat equity. So even parsing out $30,000 from the sale of the acreage as inherited property would be unjust to Robert given his own significant contributions towards improving it. *See McDermott*, 827 N.W.2d at 679 (recognizing we consider "contributions of the parties toward the property, its care, preservation or improvement" as a factor when deciding whether it would be unjust to set an inheritance apart from the divisible marital estate (citation omitted)). If there was any of that original $100,000 from 2012 remaining at the time of the dissolution trial, Linnette received it in the original decree as the court awarded both parties any bank accounts held in their own names.

It seems Linnette regretted how she chose to spend her inheritance because certain expenditures also benefited Robert. So she unilaterally decided what would be equitable and withdrew $100,000 from the joint account following the sale of the acreage.[5] The $100,000 Linnette used to purchase the two annuities clearly came from the sale of the acreage, which was a martial asset that both parties improved over the years. So the annuities are marital assets subject

---

[5] Going to the drought of detail here, we note that no witness explained what happened to the other money left in the joint savings account after Linnette removed the $100,000 and the $30,000, but it appeared to have been spent down.

to division, not inherited property as Linnette claims. As such, we find no inequity in the district court's decision to award both parties one half of both annuities.

***Linnette's IPERS.*** Linnette also contends the property division is inequitable because it divided up her IPERS pension—leaving her half of her pension, about $353 per month; her social security benefits, about $1079 per month; and half of the annuities to survive on. She argues that she needs the other half of her pension to get by month to month. In contrast, Robert still works occasionally, will have the benefit of half of the annuities, and receives more government benefits than she gets: social security benefits ($1560 per month) and disability benefits ($1514 per month). So, she reasons he does not need half of her IPERS pension.

On this point, we agree. We reach this conclusion not just because of the disparity in their monthly incomes moving forward, but because Robert testified that he would be willing to forgo any claim to Linnette's IPERS pension if he were awarded half of the annuities. Even Robert understood that Linnette would need her IPERS pension if the annuities were divided. Given that we find no inequity as to the division of the annuities, we conclude that it was inequitable for the district court to also divide Linnette's IPERS based in part on Robert's concession at trial.

We modify the dissolution decree to award Linnette the total amount of her IPERS pension.

### B. Attorney Fees

***Trial Attorney Fees.*** Linnette argues that the district court abused its discretion when it did not order Robert to pay her trial attorney fees. *See Sullins*, 715 N.W.2d at 255. "Whether attorney fees should be awarded depends on the

respective abilities of the parties to pay." *Id.* (citation omitted). Linnette points to Robert's greater monthly income to argue that he should have been ordered to pay her trial attorney fees. While Robert's monthly income is greater than Linnette's, it is still a relatively modest income. And we are cognizant of the fact that Linnette's refusal to comply with the district court's order increased Robert's own legal fees. Given this record and the fact that neither party has significant assets nor a substantial monthly income, we conclude that the district court did not abuse its discretion when it ordered the parties to pay their own legal fees.

*Appellate Attorney Fees.* Finally, Linnette requests that we order Robert to pay her appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *McDermott*, 827 N.W.2d at 687 (citation omitted). We consider the needs of the party requesting fees, the other party's ability to pay, and the merits of the appeal. *Id.* While Linnette does not have significant financial resources, Robert only has a marginally greater ability to pay. Moreover, we largely rejected Linnette's claims on appeal. As a result, we do not award her any appellate attorney fees.

## IV. Conclusion.

We conclude that the district court's property division requires an adjustment to reflect Robert's position at trial and to provide a more equitable result given the earnings disparity between the parties, so we modify the decree to award Linnette all of her IPERS pension. The district court did not abuse its discretion when it ordered the parties to pay their own legal fees, and we do not award appellate attorney fees.

**AFFIRMED AS MODIFIED.**