**IN THE COURT OF APPEALS OF IOWA**

No. 13-1592
Filed October 1, 2014

**IN RE THE MARRIAGE OF JOHN M. STEPANEK
AND JACQUELINE STEPANEK**

**Upon the Petition of
JOHN M. STEPANEK,**
        Petitioner-Appellant/Cross-Appellee,

**And Concerning
JACQUELINE STEPANEK,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Carla T. Schemmel,

Judge.


        A husband appeals, and a wife cross-appeals, the spousal support

provisions of a dissolution decree.  **AFFIRMED AS MODIFIED ON APPEAL;**

**AFFIRMED ON CROSS-APPEAL.**


        Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson P.C., West

Des Moines, for appellant.

        Becky S. Knutson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des

Moines, for appellee.


        Heard by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

John Stepanek appeals, and Jacqueline Stepanek cross-appeals, the spousal support provisions of the decree dissolving their marriage. We affirm as modified on appeal, and affirm on cross-appeal.

## I.  *Background Facts and Proceedings*

John and Jacqueline married in 1988 and divorced in 2013. They have one adult child.

At the time of trial, John was fifty years old. He received some college education, and has had specialized training for his employment over the years. At the beginning of the marriage, John worked for a funeral home in Cedar Rapids. After a few years, John began selling prepaid funeral services. John then worked for Homesteader's Life Insurance Company in Des Moines, where he eventually became the vice president of sales. For several years at Homesteader's, John was making more than $250,000 per year. In 2009, Homesteader's terminated John. He had a severance package and was subject to non-compete restrictions for a period of one year. John started a consulting service but did not see the same success he had at Homesteader's. In 2011, John began working as the vice president of operations for Baue Funeral Homes in St. Charles, Missouri. He earns $110,000 per year, plus bonuses, with a two-percent annual cost of living increase. In 2012, John earned $156,962, but gave part of his bonus ($14,668) "back to the company" because the company paid his apartment rent and allowed him to use a company vehicle.[1]

---

[1] In 2012, the company paid "probably $15,000, $20,000" for John's rent; no amount was provided for the value of John's use of the company vehicle.

At the time of trial, Jacqueline was fifty-one years old. She earned a degree from Iowa State University in family services in 1985, but has never been employed in that field of study. At the beginning of the marriage, Jacqueline worked as a flight attendant for TWA for several years. Over the years, she worked in various customer service and retail capacities, either part-time or full-time, when the parties moved to different cities for John's employment. She also cared for the parties' daughter. In 2007, Jacqueline began working for Helzberg Diamonds. At the time of trial, she worked thirty-two to thirty-eight hours per week, which was considered full-time, and earned thirteen dollars per hour, plus commission. Jacqueline expressed interest in completing a two-year college program in the field of health information technology to allow her to pursue office employment in the medical field, which she believed would be better paying and have better hours than her current employment.

John moved to Missouri when he began working for Baue Funeral Homes in 2011. Jacqueline stayed in Ankeny and put the marital house on the market. At that time, the parties planned for Jacqueline to join John in Missouri eventually. After the house sold, Jacqueline began staying with a friend in Clive. Meanwhile, in October 2012, John filed a petition for dissolution of marriage.

The district court entered a decree dissolving the parties' marriage in September 2013. Relevant to this appeal, the court divided the parties' marital property, ordered John to pay spousal support to Jacqueline ($3000 per month for five years and $1500 per month thereafter until John reaches age sixty-six and a half), and ordered John to pay $5000 of Jacqueline's attorney fees.

John appeals, and Jacqueline cross-appeals. Although the parties agree Jacqueline should receive spousal support, they challenge the district court's order in regard to the amount and duration of such support.

## II. Standard of Review

We review this equity action involving the dissolution of a marriage de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); Iowa R. App. P. 6.907. Accordingly, we examine the entire record and decide anew the legal and factual issues properly presented and preserved for our review. *McDermott*, 827 N.W.2d at 676. We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us. *Id.*; *see also* Iowa R. App. P. 6.904(3)(g). Only when there has been a failure to do equity will we disturb the district court's ruling. *McDermott*, 827 N.W.2d at 676.

## III. Spousal Support

On appeal, John challenges the district court's award of spousal support to Jacqueline, claiming it is inequitable under the circumstances of this case. John takes issue with the amount of support ordered and claims it should be lower "in amount and duration." On cross-appeal, Jacqueline contends her spousal support should not end when John turns sixty-six and a half, and she should have been awarded "permanent or lifetime" spousal support.

Spousal support is not an absolute right—it depends upon the circumstances of a particular case. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). "[P]rior cases are of little value in determining the appropriate alimony award." *In re Marriage of Becker*, 756 N.W.2d 822, 825

(Iowa 2008). The amount of spousal support is to be calculated equitably based upon all the factors contained in Iowa Code section 598.21A(1) (2013).[2] A district court has considerable latitude when making an award of spousal support. *Schenkelberg*, 824 N.W.2d at 486. We will disturb the court's ruling only when there has been a failure to do equity. *Id.* Such deference is decidedly in the public interest. *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996). "When appellate courts unduly refine these important, but often conjectural, judgment calls, they thereby foster appeals in hosts of cases, at staggering expense to the parties wholly disproportionate to any benefit they might hope to realize." *Id.*

Here, the district court noted the factors under section 598.21A of particular importance in this case include "the length of the parties' marriage, the

---

[2] These include:
  a. The length of the marriage.
  b. The age and physical and emotional health of the parties.
  c. The distribution of property made pursuant to section 598.21.
  d. The educational level of each party at the time of marriage and at the time the action is commenced.
  e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
  f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
  g. The tax consequences to each party.
  h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
  i. The provisions of an antenuptial agreement.
  j. Other factors the court may determine to be relevant in an individual case.
Iowa Code § 598.21A.

disparity in income, Jacqueline's need for support to become self-supporting and obtain education to enable her to pursue a career, and John's superior income and earning capability." John states the court's spousal support award "rings of traditional alimony but implies rehabilitative alimony." Under the circumstances of this case, we find the duration of the spousal support ordered to be equitable, but we find the support amount for the first five years to be inequitable.

With the appropriate deductions for Jacqueline's overestimation of some of her expenses,[3] we believe $2300 per month in support for five years will allow Jacqueline to meet her expenses and enjoy a standard of living closer to what she enjoyed during the marriage. This amount of support would allow Jacqueline to receive training to further her career, which she expressed she could do while continuing to work full-time in the evenings and on the weekends.[4] By the time Jacqueline's spousal support amount decreases to $1500 per month (an amount which we believe is equitable for the remaining duration of the award), Jacqueline will likely have established a higher earning capacity, more work history, and an ability to be more self-supporting. Considering his age, experience, and relevant employment skills, John has the ability to pay $2300 per month now and $1500 per month in five years without hardship, and this will be particularly so when the Lake Delhi property sells.[5]

---

[3] Jacqueline submitted a financial affidavit listing her monthly expenses. At trial, she acknowledged many of the expenses were actually paid by John, and some were listed incorrectly. In considering Jacqueline's expenses under Exhibit A, we have deducted the duplicative cable and internet expense, the payments associated with the property at Lake Delhi, and the Mass Mutual and Thrivent payments.

[4] Full-time employment would make Jacqueline eligible to purchase health and dental insurance through her employer.

[5] At the time of trial, the parties' property at Lake Delhi was for sale. Until its sale, John made the payments associated with that property of approximately $1400 per month.

We therefore modify the support amount for the first five years to $2300 per month. Finding it appropriate and equitable considering the facts and circumstances of this case, we affirm the remaining portion of the district court's award of spousal support.

John also challenges the provision in the decree requiring him to "maintain an existing life insurance policy or policies in an amount of $100,000 or the monthly amount payable [on his support obligation] until he reaches the age of 66 and 1/2, whichever is less." John acknowledges the district court has authority to order him to maintain life insurance to secure his support obligation. *See Stackhouse v. Russell*, 447 N.W.2d 124, 125 (Iowa 1989) ("A provision in a dissolution of marriage decree to maintain life insurance is enforceable."). However, John claims "the insurance requirement in this case is unjustified" because the policy costs an additional $133 per month to maintain.

John points to the unpublished opinion *In re Marriage of Weber*, No. 98-1688, 2000 WL 278535, at *10 (Iowa Ct. App. Mar. 15, 2000), in which this court struck a provision requiring the husband to maintain life insurance because the wife did not present evidence demonstrating the need for such a requirement or evidence to show that the cost to maintain such a policy would not be "unduly burdensome" when compared to the policy's benefits. We find the present case factually different from the unpublished opinion in *Weber* because Jacqueline requested the security of a life insurance policy and demonstrated a need to have John provide alimony funds in the event of his death before expiration of the alimony award. In addition, Jacqueline presented evidence of the cost to maintain such a policy, which the district court reasonably could have found was

not unduly burdensome to John. *See In re Marriage of Casten*, No. 11-0796, 2012 WL 1860358, at *9 (Iowa Ct. App. May 23, 2012) (affirming life insurance requirement to secure spousal support obligation where the record contained "substantially more information than the record in *Weber* regarding evidence of insurability, costs, and reason for imposing the requirement"). We affirm the requirement of life insurance to secure spousal support.

## IV.    Trial Attorney Fees

John challenges the district court's award of trial attorney fees to Jacqueline. He claims Jacqueline was awarded—via the property distribution—sufficient assets from which to pay her own attorney fees. John requests this court "substantially lower, if not vacate" the award of attorney fees to Jacqueline.

An award of trial attorney fees rests in the sound discretion of the district court and should not be disturbed on appeal in the absence of an abuse of discretion. *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). Whether attorney fees should be awarded depends on the parties' respective abilities to pay, *see In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006), and fees awarded must be fair and reasonable, *see In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). Considering the disparity in the parties' earning capacities and abilities to pay, we find the court exercised its discretion in ordering John to pay $5000 toward Jacqueline's attorney fees. We affirm on this issue.

## V.    Appellate Attorney Fees

Jacqueline seeks an award of appellate attorney fees. Such an award is discretionary. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App.

2007).  Although Jacqueline's income and ability to pay attorney fees is lower than John's, John was successful on appeal.  We decline Jacqueline's request to order John to pay toward her appellate attorney fees.

Costs of appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**