# IN THE COURT OF APPEALS OF IOWA

No. 14-0135
Filed November 26, 2014

**IN RE THE MARRIAGE OF KELLY MARIE VAUGHN**
**AND ANDREW JOSEPH VAUGHN**

**Upon the Petition of**
**KELLY MARIE VAUGHN,**
      Petitioner-Appellant,

**And Concerning**
**ANDREW JOSEPH VAUGHN,**
      Respondent-Appellee.

_____

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

A mother challenges the provision in the dissolution decree granting the parents joint physical care of their son. **AFFIRMED.**

Richard F. Mitvalsky of Gray, Stefani & Mitvalsky, P.L.C., Cedar Rapids, for appellant.

Constance Peschang Stannard of Johnston, Stannard, Klesner, Burbidge & Fitzgerald, P.L.C., Iowa City, for appellee.

Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

Kelly and Andrew Vaughn are the parents of W.A.V., who was three years old at the time of the dissolution trial. The decree granted the parents joint physical care. Kelly argues W.A.V.'s best interests would be served by placing physical care with her and allowing Andrew liberal visitation. After weighing all of the pertinent factors, we affirm the physical care arrangement set forth in the decree.

Kelly and Andrew dated for more than five years before getting married in September 2004. Kelly is a teacher at St. Pius Elementary School in Cedar Rapids. Andrew is a human resources supervisor at GEICO insurance company in Coralville. Both are thirty-four years old and in good health. Kelly has a master's degree in education from the University of Northern Iowa. Andrew has an associate of applied science degree and has been working on and off toward his bachelor's degree, but has yet to complete it.

Kelly filed a petition to dissolve the marriage on January 30, 2012. She has remained in the marital home in Marion with W.A.V. since the separation. Andrew has lived in a few different locations, but has now settled back in Marion. The district court issued a temporary order on March 27, 2012, giving Kelly physical care and awarding Andrew visitation. Following trial, the district court issued its dissolution decree on December 23, 2013. The decree gave Andrew and Kelly joint legal custody and joint physical care of W.A.V.

The only issue on appeal is the grant of joint physical care. Kelly argues the district court should have placed W.A.V. in her physical care because she

has been the boy's primary caregiver during his first three years. Andrew asserts the court properly awarded joint physical care because both parents have much to contribute to their son's daily upbringing.

We review dissolution of marriage cases do novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We give weight to the district court's findings, especially regarding the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g).

Custody decisions need to assure a child of divorce the "maximum continuing physical and emotional contact with both parents" insofar as is reasonable and in the child's best interests. Iowa Code § 598.41(1)(a) (2011). We examine the joint physical care issue "in each case on the unique facts and not subject to cursory rejection" based on outdated presumptions. *See In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The consideration of joint physical care is based on "Iowa's traditional and statutorily required child custody standard—the best interest of the child." *Id.* The goal is to place the child in the environment most likely to bring him to health, both physically and mentally, and to social maturity. *See id.* In making decisions about joint physical care, we avoid gender bias toward either mothers or fathers. *Id.* at 700.

The legislature set out factors for courts to consider when determining the optimal care arrangement. *See* Iowa Code § 598.41(3). We also look to the non-exclusive considerations articulated in *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974) (including the needs of the children, the characteristics

of the parents, the relationship between each child and each parent, and the stability and wholesomeness of the proposed environment).

In *Hansen,* our supreme court outlined four non-exclusive factors to consider in deciding whether shared care is appropriate. *Hansen*, 733 N.W.2d at 696-700. Those factors include: (1) the stability and continuity of care-giving for the child, (2) the ability of the parents to communicate and show mutual respect, (3) the degree of conflict between the parents, and (4) the degree to which the parents generally agree about their approach to daily child-rearing matters. *Id.* After a de novo review of the record, we find the circumstances in this case weigh in favor of the parents having joint physical care of W.A.V. We provide the following analysis of each *Hansen* factor.

### 1. Stability and continuity of care

Generally, "[s]tability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care." *Id.* at 696. There is no real question Kelly provided the majority of care for W.A.V. during the marriage. The parents agreed to this division of labor because Kelly's job as a teacher was more conducive to spending time with the child while Andrew worked longer hours away from home and earned a higher income for the family. Kelly had a winter break and did not work in the summers. She also had a more generous family sick leave policy than Andrew did through his work, allowing her to take time off to care for W.A.V. when he was ill. By contrast, Andrew commuted to Coralville and often logged ten to twelve hour days, sometimes working as many as fifteen hours a day in 2011.

In anticipation of sharing more equally in W.A.V.'s care, Andrew testified he has tried to cut back his hours and works less hours than he did in 2011. Andrew also testified he intends to pursue opportunities in the longer term which would enable him to keep a more regular schedule. In the meantime, both parents have the option of seeking assistance with W.A.V. from family members. Both Andrew and Kelly have extended family in eastern Iowa to support them. While not used on a daily basis, these relatives have been called upon to help the parents and will remain as resources in the future. In particular, Andrew's mother has assisted with child care. She has watched W.A.V. when he was sick and would pick him up from daycare if Kelly and Andrew were unable to do so. In addition, the grandmother testified W.A.V. would spend the night or weekends with her if Andrew and Kelly had plans that took them out of town.

We recognize where one spouse has been the primary caregiver, the likelihood increases that joint physical care after the divorce could disrupt the emotional development of the child. *Id.* at 698. But approximation of the pre-divorce care-giving pattern is not the sole determinative factor in deciding on a post-divorce physical care arrangement. *In re Marriage of Berning*, 745 N.W.2d 90, 93 (Iowa Ct. App. 2007). We also consider the quality of the relationship that the child has with each parent. *Id.*

Andrew has a strong bond with W.A.V. and participated in child care duties when he was home from work. Andrew often took care of W.A.V. in the mornings—changing diapers and getting the child ready for the day. When Andrew arrived home from work before W.A.V. was put to bed, Andrew would

read to him and give him a bath. The record shows Andrew is able to meet W.A.V.'s day-to-day needs. Kelly acknowledged Andrew is a good father and a capable parent.

In addition, like the situation in *Berning*, 745 N.W.2d at 93, the approximation factor is mitigated here by the fact W.A.V. has spent a significant amount of time in daycare while both of his parents have been at work. W.A.V. attends the same daycare, no matter if he is in the care of Andrew or Kelly. In addition, W.A.V. is approaching the age where he will be enrolled in preschool and then elementary school. The parties testified W.A.V. would start kindergarten in 2015, and would attend every weekday during normal school hours. Accordingly, W.A.V.'s routine during the day will remain consistent regardless of the physical care arrangement between the parents.

The district court was insightful in its observation that whether it ordered joint physical care or physical care to Kelly, neither parent "will have the amount of time they want" with W.A.V. The question is whether the child's stability and opportunity for growth is best achieved by ordering joint physical care in this case. In doing so, we balance the concept of approximation of care against the opportunity for maximum continuing contact with both parents offered by joint physical care. *See In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000) (noting such contact can be assured by means other than a traditional, alternating-weekends visitation schedule).

Contrary to Kelly's position, we do not believe the stability and continuity of care factor rules out joint physical care.

## 2. Parents' ability to communicate

The second *Hansen* factor examines the ability of the ex-spouses to communicate, trust each other, and show mutual respect. *Hansen*, 733 N.W.2d at 698. Kelly and Andrew testified they are able to communicate most effectively about W.A.V.'s needs through e-mail or text messaging. While these electronic means are not a complete substitute for personal discussions, they do enable the parents to exchange vital information.

The record indicates Andrew and Kelly have had animosity toward each other in the past, but have been able to share news about their son. Kelly testified: "Andrew and I have communicated frequently about different things" including potty training and sleep schedules. Andrew testified: "I don't have a problem communicating with Kelly for the most part." The district court found the parents have been "far less contentious" with each other since the separation. We find the parents' ability to communicate and show mutual respect supports the grant of joint physical care.

## 3. Conflict between the parents

The third *Hansen* factor looks to the degree of conflict arising in the parents' interactions. *Id.* Kelly and Andrew have not been immune from conflict concerning W.A.V. Andrew testified, "Kelly made it clear that she was going to minimize my time with him." For instance, in December of 2012, Andrew had arranged with Kelly to have care of W.A.V. for one week because he had two weeks of vacation from work. According to Andrew, he switched visitation weekends with Kelly to achieve this goal and Kelly agreed to the change in

schedule.  But when that week came, Kelly did not allow Andrew to have W.A.V. This incident highlights Kelly's tendency to be less flexible about W.A.V.'s schedule than Andrew would desire.  We believe that flexibility will flow more naturally from the joint care schedule and will provide both parents valuable time to bond with W.A.V.

The *Hansen* court noted: "The prospect for successful joint physical care is reduced when there is a bitter parental relationship and one party objects to the shared arrangement."  *Id.*  While Kelly would prefer having physical care of W.A.V., we do not find her objection to joint care will endanger the success of the arrangement.  Her testimony did not sound embattled or bitter.  Kelly testified she thought Andrew was a good father and she would have no problem with him caring for W.A.V. for an extended period of time or if something were to happen to her.

Another consideration is Andrew's new paramour.  While Kelly initially expressed reservations about W.A.V. being introduced to a new person, her concerns seem to have subsided.  Normally, we will examine a new relationship "[i]f a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the children becomes a significant factor in a custody dispute."  *See In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003).  The record here does not suggest Andrew and his girlfriend are planning to establish a home together at this time or that Andrew relies on his girlfriend to care for W.A.V.  Even if their plans change, we have not been alerted to any facts about the girlfriend which would cause concern.

Accordingly, we do not see Andrew's new relationship as bearing on the grant of joint physical care.

We do not believe any lingering conflict between the parents will outweigh the potential benefit of joint physical care for W.A.V. The parents' testimony revealed a mutual acceptance of the other's time with the child, which will go a long way toward ensuring the success of the shared arrangement.

**4. Parents' approaches to daily care matters**

The final factor from *Hansen* is the compatibility of the approaches taken by the parents to daily matters of care. *Hansen*, 733 N.W.2d at 699. In this case, the district court wrote that any disagreements between Kelly and Andrew over parenting styles involved "relatively minor subjects like [W.A.V.'s] daily schedule, activities, bedtime, etc." Kelly aptly points out that for a three-year-old child these subjects are formative and central to the child's cognitive and emotional development. But reading the decree as a whole, it is evident the court understood these were not minor subjects, and actually meant that the parents had minor disagreements about these important subjects.

On appeal, Kelly highlights her concerns over Andrew's inattention to W.A.V.'s specific nap and bed times and over Andrew's meal choices for W.A.V. at his residence. The following exchange at trial reveals her position:

> [Counsel]: What do you think would be the consequence to [W.A.V.] if [Andrew's] schedule were established, or he would spend equal time between your two homes? [Kelly]: I think that with Andrew's lack of consistency with bed time, I think that's definitely going to affect [W.A.V.'s] cognitive development. It's really important that he's getting enough sleep and going to bed on time and eating well balanced meals.

For his part, Andrew testified: "We disagree on some things sometimes, that's definitely true, but we definitely agree on the big pieces."

Kelly is correct that sleep schedules and healthy nutrition are important considerations in the day-to-day parenting of a young child. But after our full consideration of the record, we do not see an irreconcilable difference between her more systematic method of parenting and the more flexible approach taken by Andrew. Both parents have a strong commitment to W.A.V.'s well-being, and slight variations in nap times and food choices do not defeat the promise of joint physical care. In other words, "both parents appear to be operating on the same page as to child rearing style . . . ." *See Berning*, 745 N.W.2d at 94.

Kelly raises an issue on appeal concerning W.A.V.'s religious upbringing. The trial record reveals a potential disagreement on the question whether W.A.V. will attend public or parochial school. Kelly testified she was committed to having W.A.V. enroll at St. Pius where she teaches, while Andrew expressed a preference for public schools. But neither Andrew nor Kelly offered resolute opinions on the subject and as both parents have joint legal custody, this is a choice they will have to agree on no matter the physical care arrangement.[1] *See* Iowa Code § 598.41(5)(b).

Other pertinent factors from section 598.41(3) also support the grant of joint physical care. For instance, each parent is a suitable custodian; active contact and attention from both parents will foster W.A.V.'s emotional

---

[1] At oral argument, Kelly's attorney concurred that schooling would be a joint decision, regardless of shared care being in place.

development; and the geographic proximity of the parents' residences allows for smooth transitions between homes.

We find it encouraging even on issues where they might disagree, the parents testified they are open to considering the other's views. The district court found "the Court has no doubt both parties legitimately want what is best for [W.A.V.] and both parties generally agree on how [W.A.V.] should be raised." We agree with the district court's sentiments. W.A.V. is lucky to have two capable and devoted parents who want to spend time with him and prepare him for a happy and well-adjusted future. In conclusion, reviewing the record through the lens of the *Hansen* factors, as well as the statutory criteria, we concur in the district court's decision to grant joint physical care.

**AFFIRMED.**