# IN THE COURT OF APPEALS OF IOWA

No. 14-2065
Filed August 19, 2015

**IN RE THE MARRIAGE OF JOHN AARON LIVINGSTON**
**AND JENNIFER ELAINE LIVINGSTON**

**Upon the Petition of**
**JOHN AARON LIVINGSTON,**
        Petitioner-Appellee,

**And Concerning**
**JENNIFER ELAINE LIVINGSTON,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Story County, Michael J. Moon,

Judge.


        A former wife challenges the economic aspects of the dissolution decree.

**AFFIRMED AS MODIFIED.**


        Joseph R. Cahill of Cahill Law Office, Nevada, for appellant.

        Angelina M. Thomas of Newbrough Law Firm, L.L.P., Ames, for appellee.


        Considered by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, P.J.**

Jennifer Livingston appeals from the district court's distribution of assets in the decree dissolving her marriage to John Livingston, asserting she is entitled to a larger share of the marital estate. Because we find John gifted separate property (specifically the net value of his premarital home) to Jennifer, we modify the distribution as to that property. We find the remainder of the decree achieved equity between the parties and affirm as modified.

## I.        Background Facts and Proceedings

John and Jennifer were married in April 1996.[1] Before their marriage, the parties entered into an antenuptial agreement detailing the premarital assets they considered "separate property." John's assets included a forty-five percent stake in R & L Automatic Services, Inc., a family business operating coin laundries and a car wash in Ames. John also owned a forty-five percent stake in Livingston Investments, LLC, which owned the property on which R & L operated. John's parents, Lee and Gail Livingston, owned the remaining fifty-five percent of both R & L and Livingston Investments. Additionally, John owned a home on White Oak Drive in Ames and an IRA account.

After they married, John deeded the White Oak Drive home to Jennifer and himself as joint tenants. Later, they sold the home and used the proceeds to purchase a house on Idaho Avenue in Ames. In 2007 the parties paid off the mortgage on that house with $200,000 borrowed from John's parents. His parents did not take a lien on the property, but the parties signed a promissory

---

[1] They have one child together. Custody and visitation rights were resolved through mediation before trial and are not at issue on appeal.

note which remains outstanding; an $875 interest-only payment on the note is due monthly.

In addition to being an owner of R & L, John has worked for the company since the beginning of the marriage. In 1998 R & L purchased a laundromat business and its associated lease in the North Grand Mall in Ames. John and Lee testified that since the purchase, R & L had not been profitable and was being supported by contributions from Lee. In 2011, once the North Grand lease was sold, Lee gave John his ownership stake and stopped making contributions directly to R & L. But Lee continued lending money to John to support the business. John receives an income from his position at R & L—in 2012 he earned $12,692 and in 2013 he earned $2100. John worked part time for UPS during 2011 and at a convenience store in Des Moines during 2011 and 2012, earning twelve to thirteen dollars an hour.

In addition to these more traditional lines of work, John fancies himself an entrepreneur. He has used funds received from sales of premarital assets and loans or gifts from friends and family to fund his entrepreneurial pursuits, most of which have resulted in substantial losses. With borrowed money he has purchased non-publicly traded stocks and day traded[2] public stocks. He has bought cars over the internet to resell. He has purchased many cheap, potentially valueless, properties online, hoping to strike it rich. In partnership with his father, he has purchased distressed real estate to rehabilitate and resell. In

---

[2] Black's Law Dictionary defines "day trading" as, "The act or practice of buying and selling stock shares or other securities on the same day, esp[ecially] over the internet, usu[ally] for the purpose of making a quick profit on the difference between the buying price and the selling price." *Black's Law Dictionary* 1725 (10th ed. 2014).

January 2013 John became a licensed real estate agent. At the time of trial, he had earned $27,566 in commissions in 2014. According to John, expenses for his real estate business total $3282 per month. For child support purposes, John agreed to an assigned annual income of $35,000.

In contrast to John's varied pursuits, Jennifer was steadily employed as a dental hygienist throughout the marriage. She earned $54,581 in 2013. At the time of trial, she had reduced her hours to cope with an injury to her index finger resulting from an automobile accident in 2009. Jennifer testified the injury may require future medical care and, at times, interferes with her work. She received a personal injury settlement as a result of the accident; a portion of the funds she received from the settlement are at issue on appeal.

John filed a petition for divorce on July 16, 2013. Discovery revealed to Jennifer that John had incurred significant debts to his parents, other family members, friends, and his paramour Tracy Cook. Tracy's husband, presumably in an effort to resolve the dissolution of his own marriage, filed a motion to intervene in the current action, claiming Tracy had loaned John upwards of $260,000 of their marital assets between 2011 and 2013. The court denied the motion to intervene. John claims the majority of the funds he received were gifts from Tracy, though he acknowledges in May 2013 Tracy loaned him $87,000, as evidenced by a promissory note.

Following two days of testimony, the court issued its dissolution decree on October 3, 2014, and divided the parties' marital debts and property as follows:

| Original Distribution | | |
| --- | --- | --- |
| Marital Property | John | Jennifer |

| | | |
|---|---|---|
| Marital Home | $142,500 | $142,500 |
| Promissory Note | (200,000) | - |
| | | |
| Personal Property | 6,678 | 14,000 |
| Investment Accounts | 160 | 18,794 |
| Checking and Savings | 690 | 1,969 |
| Retirement Accounts | 32,550 | 31,448 |
| | | |
| Marital Debts | (51,825) | (1,044) |
| | (69,247) | 207,667 |
| | | |
| John's Personal Property | | |
| Marital Home Equity | 7,363[3] | - |
| R & L Assets | 1,868 | - |
| Wells Fargo IRA | - | - |
| Personal & Business Debt | (191,396) | - |
| | (182,165) | - |

In accordance with the parties' antenuptial agreement, the district court excluded R & L's debts and assets from the distribution. In addition, the court assigned solely to John his personal debts owed to his family, friends, and Tracy Cook. The court awarded the marital home to the parties as cotenants. But, as the custodial parent of their daughter, Jennifer was awarded sole possession of the home until the daughter graduated from high school, at which time the home was to be sold.

Both parties filed a motion to amend and enlarge under Iowa Rule of Civil Procedure 1.904(2). On November 14, 2014, the court issued a post-trial order, granting several of John's requests. The court divided the $200,000 house debt

---

[3] The decree states that John would not receive an offset for his equity in the White Oak home, but the court included a partial offset in the list of John's personal property without reducing the total equity of the marital home. This resulted in a double counting of $7363.

owed to John's parents equally between the parties. Rethinking the delay of ten years until the parties' daughter graduated from high school, the court ordered the home be listed for sale on May 1, 2016. Upon sale of the home, the $200,000 debt was to be paid first, and then John was to receive $7363 to compensate him for his contribution of antenuptial assets toward the purchase of the home. The court ordered any remaining sale proceeds be divided equally between the parties. The court granted John's request that his Wells Fargo IRA, valued at $1103 and funded by another IRA account that was listed as his asset in the antenuptial agreement, be set aside as his sole property. The court further awarded John sole ownership of an investment account funded by a portion of Jennifer's personal injury settlement, valued at $7701.

The post-trial order distributed assets as follows:

| Modified Distribution | | |
|---|---|---|
| Marital Property | John | Jennifer |
| Marital Home | $138,819 | $138,819 |
| Equity Offset | 7,363 | - |
| Promissory Note | (100,000) | (100,000) |
| | | |
| Personal Property | 6,678 | 14,000 |
| Investment Accounts | 7,861 | 11,093 |
| Checking and Savings | 690 | 1,969 |
| Retirement Accounts | 31,447 | 31,448 |
| | | |
| Marital Debts | (51,825) | (1,044) |
| | 41,033 | 96,284 |

<u>John's Personal Property</u>

| | | |
|---|---|---|
| Marital Home Equity | - | - |
| R & L Assets | 1,868 | - |
| Wells Fargo IRA | 1,103 | - |
| Personal & Business Debt | (191,396) | - |
| | (188,425) | - |

Jennifer urges three modifications on appeal. She claims we should rule (1) John dissipated marital assets, (2) John is not entitled to an offset of $7363 in the equity of the home, and (3) John is not entitled to an account funded by a portion of her personal injury settlement.

## II.    Standard of Review

Because the district court hears dissolution of marriage proceedings in equity, our review is de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); *see also* Iowa Code § 598.3 (2013); Iowa R. App. P. 6.907. Although we are not bound by them, we give weight to the factual findings of the district court, especially its findings of credibility. Iowa R. App. P. 6.904(3)(g); *McDermott*, 827 N.W.2d at 676. Despite our de novo review, "'we accord the trial court considerable latitude in making its determination and will disturb the ruling only when there has been a failure to do equity.'" *McDermott*, 827 N.W.2d at 676 (quoting *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005)).

## III.    Dissipation

Jennifer claims she is entitled to a greater share of the distributed property due to John's dissipation of assets. "A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution." *In re Marriage of Kimbro*, 826 N.W.2d 696, 700 (Iowa 2013).

Dissipation occurs "when a spouse's conduct during the period of separation 'results in the loss or disposal of property otherwise subject to division at the time of divorce.'" *Id.* at 700–01 (Iowa 2013) (quoting *In re Marriage of Burgess*, 568 N.W.2d 827, 828 (Iowa Ct. App. 1997)). Upon a finding of dissipation, the value of the dissipated asset is included in the marital estate and awarded to the spouse who squandered the asset. *Id.* at 701.

After establishing the assets in question were otherwise subject to division, Iowa courts must decide whether the alleged purpose of the expenditure is supported by the evidence, and if so, whether that purpose amounts to dissipation under the circumstances. *In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007); *see Burgess*, 568 N.W.2d at 829 ("We do not believe the focus should be whether or not a spouse is personally responsible for a debt incurred by the other spouse, but whether the payment of the obligation was a reasonable and expected aspect of the particular marriage.").

In support of her dissipation claim, Jennifer points to deposits made into John's three checking accounts. According to her math, John deposited a total of $850,718 into the accounts between July 2012 and August 2014, approximately one year on each side of his July 2013 filing of the divorce petition. Jennifer claims the deposits, when compared to his modest income during that period, show John must be hiding marital assets. John questions Jennifer's accounting methods, as do we. During the marriage, John had a habit of borrowing from one source to pay off loans to others, borrowing money in anticipation of incoming funds, and shifting funds from one account to another as

expenses came due. Tracking only the deposits from these transactions could make a modest sum appear to be a considerable fortune. Totaling the deposits within the three accounts does not provide a reliable accounting of John's assets.

We are not only skeptical of Jennifer's overarching complaints concerning John's diversion of assets, but when reviewing her specific claims, we do not believe she has made the threshold showing that the allegedly dissipated assets were otherwise subject to division in the dissolution decree. Instead, we are persuaded by John's appellate argument that his financial ventures were not funded with marital money, but rather with assets subject to the antenuptial agreement or with individual gifts. John does recognize the loan he received from Tracy Cook may be considered marital property, but emphasizes that he has agreed to take sole responsibility for that debt, as well as all remaining liabilities resulting from his unsuccessful endeavors. Finally, he contends Jennifer is not entitled to credit for his unrealized gains, when the decree did not assign her any of his actual losses. We agree.

We will address each of Jennifer's dissipation claims in turn.

**A.     The NewLink Genetics Stock Sale in March of 2013**

Jennifer contends John dissipated $64,962 he received from the sale of stock in March of 2013 because he cannot account for the use of the funds. In 2007 John and his father Lee anticipated R & L would receive a substantial profit from the sale of the lease it held at the North Grand Mall in Ames. John sought an advance from Lee for his share of the profit in the form of NewLink Genetics stock. Lee purchased $50,000 worth of NewLink stock for John; Lee held the

stock in his name because John was not qualified to own the stock before its public offering. The two agreed John would repay the $50,000 to Lee with a portion of his share of the profit from the anticipated lease sale. After they sold the lease for much less than anticipated, they memorialized the debt in a $50,000 promissory note dated December 4, 2012, which required John to pay the balance when the price of NewLink stock reached $100 per share. NewLink then went public, allowing Lee to transfer the stock to John's name. John sold the stock in March of 2013, receiving the $64,962 at issue.

At trial, John first guessed he placed $50,000 of those funds into his Scottrade account. When presented with the statements for that account, John could not show when those funds were deposited. Admitting he must have been wrong about where the funds went, John testified the Scottrade account was funded by a loan from Tracy Cook. The account had a minimal balance until May 2013, when $78,000 was deposited. The timing of the deposit coincided with a loan of $87,000 that John received from Tracy Cook, without Jennifer's knowledge, memorialized with a promissory note on May 15, 2013. John used those loaned funds to day trade the now-public NewLink stock. After a volatile, and at times successful, thirteen months of trading, the account value had dwindled to $28,435 by May 2014. John withdrew $28,350 from the account, and after fees, only $60 remained in the account at the time of trial.

As evidenced by a promissory note dated June 18, 2014, John used the $28,350 from closing the account to partially pay off the original $50,000 borrowed from Lee—$21,650 remains outstanding on the note. Combining this

debt with the $87,000 promissory note outstanding to Tracy Cook, John still owes $108,650.00 as a result of his stock trading. The district court gave John sole responsibility for the debt without an offset for marital asset distribution, which he does not contest.

In support of her dissipation claim, Jennifer cites *In re Marriage of Newlander*, No 06-0115, 2006 WL 3314532, at *7 (Iowa Ct. App. Nov. 16, 2006), where the husband filed for divorce in 2004, and the district court found the husband "as early as 2002 . . . had been maneuvering assets in anticipation of seeking divorce," including secreting funds from a brokerage account. On equitable grounds, the *Newlander* court attributed the value of the brokerage account to the husband when distributing marital assets, and this court affirmed. *Newlander*, 2006 WL 3314532, at *7. We do not find *Newlander* persuasive here. Unlike the present case, in *Newlander* the record did not show any outstanding debt on the brokerage account. *See id.*

John argues the stock-sale proceeds of $64,962 are not subject to distribution because the $50,000 he used to purchase the NewLink stock was collateralized by an asset subject to the parties' antenuptial agreement (proceeds from the anticipated R & L lease sale). We agree with John's characterization of the asset: John and Lee both testified the loan was to be repaid using R & L proceeds; Jennifer's name was not on the promissory note made to Lee memorializing the debt; once the company went public, the stock was held in John's name alone; and the note was partially repaid using borrowed funds. Importantly, John has accepted sole responsibility for the outstanding debts

outside the marital estate. Under these circumstances, we agree with the district court's decision not to offset John's share of assets by the stock-sale proceeds of $64,962.15.

## B. The Balance of John's Scottrade Account

John's day trading was not altogether unsuccessful. By March 2014 John had turned the original $87,000 he borrowed from Tracy Cook into $155,857. Around this time, John made an offer to Jennifer, using this money to "help facilitate" a settlement of their divorce. No settlement was reached. John continued to trade on the account. As described above, by May 2014 John had reduced the account's value to $28,435; he used the majority of the remaining funds to partially pay off the $50,000 debt to Lee.

Describing John's day trading as "irresponsible" and "reckless," Jennifer claims John's losses amount to dissipation of marital assets. She cites *In re Marriage of Martens*, where this court affirmed a finding of dissipation based on the husband's gambling habit and inability to account for funds that were clearly marital property. No. 03-0549, 2004 WL 358889, at *3-4 (Iowa Ct. App. Feb. 27, 2004). To justify a $60,000 dissipation offset, this court considered the marital property for which the husband could not account. *Id.*

Jennifer urges us to find dissipation based on a snapshot of the value of a very volatile account—essentially she asks for a finding that John dissipated marital assets by failing to step away from the table while he was ahead. When the account, funded by a loan from Tracy Cook and now reduced in value, was liquidated, John used the funds to pay off his personal debt to Lee. The district

court assigned John the outstanding debt to Tracy Cook without making a corresponding offset to his marital property. Because we deem this debt assignment to be equitable, we agree with the district court's refusal to grant Jennifer an offset for dissipation based on John's day trading of the loaned funds.

### C.    Promissory Note from Lee Livingston

Jennifer argues John dissipated an *additional* $50,000 lent to him by Lee in December of 2012 by failing to account for the funds. At the time of trial, John had not repaid this loan to Lee, and Lee testified that he expected repayment. John and Lee had differing accounts of what this money was used for. Lee testified he thought John was going to use the money to purchase more NewLink stock. John testified the promissory note was a consolidation of several smaller debts John had outstanding with Lee at the time. The district court ordered John to take sole responsibility for the debt—making what the funds were used for immaterial. *See Fennelley*, 737 N.W.2d at 106 n. 6 (assigning the debt associated with the squandered asset to the dissipating party as a remedy). The district court correctly assigned the debt to John, outside of the distribution of marital assets, and correctly denied Jennifer any additional offset for dissipation.

### D.    Out-Of-State Real Estate

Throughout 2012 John purchased numerous parcels of out-of-state real estate over the internet, sight-unseen, and with no due diligence. John spent $67,734 on the properties and held them in R & L. John testified that in 2013 he discovered the properties were worthless for various reasons—tax deficiencies, environmental restrictions, or ongoing litigation. When John told his accountant

about the properties, John learned R & L would incur significant legal fees to legitimately own property in states other than Iowa or to transfer title to John personally. At the time of trial John had not sold the properties but testified he intended to forfeit the properties by not paying their real estate taxes. John wrote the properties off as a near total loss on R & L's taxes.

Jennifer claims marital assets must have been used to purchase the properties because R & L did not have the resources to make the purchases, but she did not offer evidence that marital assets were used. When asked where the money to purchase the properties came from, John denied marital funds were used, explaining he spent "either funds that were already in [R & L's] checkbook, funds that my father infused into the company, [or] monies that I borrowed from Tracy." A finding of dissipation requires that the squandered assets would have been subject to distribution. *Burgess*, 568 N.W.2d at 828 (stating the supposedly dissipated property must be "subject to distribution at the time of divorce"). Jennifer's assertion by inference—weakened substantially by John's testimony of the antenuptial source of the funds—is insufficient to establish these funds would have been subject to distribution. Additionally, even if John borrowed the money, he was given sole responsibility for the associated debt outside the marital distribution, thus, any additional compensation to Jennifer for dissipation would be inequitable.

## IV. Award of Home Equity to John

Jennifer asserts the trial court erred by awarding John $7363 to compensate him for the equity from his White Oak Drive home. The White Oak

Drive home was listed as separate property in the parties' antenuptial agreement. The net value of the home, as stated on the agreement, was $27,363. At trial and in his post-trial motion, John sought an offset for this equity, which he testified was used to purchase the couple's marital home on Idaho Avenue.

The original decree stated that the "act of deeding the property to Jennifer removed that residence and the proceeds from its subsequent sale from the protections afforded by the antenuptial agreement." The final post-trial order, though, granted John $7363[4] from the sale of the home before any sale proceeds were divided.

Antenuptial contracts are to be liberally construed to carry out the intentions of the parties. *In re Marriage of Pillard*, 488 N.W.2d 714, 715 (Iowa Ct. App. 1989). We interpret the agreements as we do an ordinary contract. *Id.* Pertinent sections of the Livingstons' agreement provide:

> The parties agree that replacement of, or additions to, Separate Property can occur an unlimited number of times so long as the property and proceeds can be traced with reasonable accuracy.
> . . .
> It is further agreed that nothing herein shall be construed to be a bar to either party to this agreement giving any property of which they may be possessed to the other party by will or otherwise, it being understood that each party to this agreement shall control his or her personal estate.

We agree with the district court's initial assessment; John intended to gift half of the White Oak Drive home to Jennifer, thereby subjecting it to distribution.

---

[4] It is unclear whether the district court considered the equity subject to the antenuptial agreement and made a typographical error by awarding John $7363 rather than $27,363 or if the district court considered the equity beyond the antenuptial agreement and awarded John $7363 on equitable grounds. We proceed assuming the former.

Months after their marriage, John deeded the home to Jennifer and himself as joint tenants. At trial he produced no evidence of the sale price of the home or the amount contributed to the purchase of the Idaho Avenue home. The offset he sought was based only on the equity in the home as described in the antenuptial agreement. Had he intended to maintain the equity as his separate property, he would have kept an accounting so that the proceeds could be "traced with reasonable accuracy" as required by the antenuptial agreement.

Considering the factors set forth in Iowa Code section 598.21(5)—especially the length of the marriage and the contribution of each party to the marriage—an equal division of the proceeds from the house sale is more equitable. Accordingly, we modify the post-trial order; proceeds from the sale of the Idaho Avenue home, after payment of the $200,000 debt to John's parents, shall be divided equally between the parties—with no offset.

## V.   Award of Personal Injury Funds to John

Jennifer disputes the district court's award to John of a Scottrade brokerage account, valued at $7701 and funded by a portion of her personal injury settlement. The original decree awarded the account to Jennifer. Jennifer argues the change was clearly an oversight by the court because John did not request the account in his post-trial motion. But John's motion did argue the original "asset/debt reconciliation" was inequitable. While the order did not state its rationale, it was explicit in ordering, "The Scottrade account ending in 9769 shall be John's sole property."

As the Iowa Supreme Court has said, "proceeds of a personal injury claim are marital assets, to be divided according to the circumstances of each case." *In re Marriage of McNerney,* 417 N.W.2d 205, 206 (Iowa 1987). The remainder of Jennifer's personal injury settlement, $23,015 in a savings account, was allocated to Jennifer outside of the couple's property distribution. Given the overall lopsided allocation of assets (and debts) between the parties and the explicit nature of the order, we find the court awarded the account to John in response to his request for a more equitable distribution. We affirm the district court's award of the Scottrade account to John.

## VI.    Attorney Fees

John requests we order Jennifer to pay his attorney fees associated with this appeal. Iowa Code section 598.36 grants us discretion in awarding appellate attorney fees, but an award is not a matter of right. *In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). To address a request for attorney fees we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). Jennifer prevailed in part on appeal. Considering the merit of her claims and the relative resources of the parties, we decline to award John appellate attorney fees.

## VII.    Conclusion

In sum, we affirm the district court's distribution of assets in large part and modify only the allocation of proceeds from the sale of the marital home. After

paying the home-related debt to John's parents, John and Jennifer shall receive an equal share of the proceeds from the sale.

Costs are divided equally between the parties.

**AFFIRMED AS MODIFIED.**