**IN THE COURT OF APPEALS OF IOWA**

No. 18-0510
Filed January 9, 2019

**IN RE THE MARRIAGE OF CATHERINE M. JACOBS
AND CARL LEE JACOBS**

**Upon the Petition of
CATHERINE M. JACOBS,**
        Petitioner-Appellant,

**And Concerning
CARL LEE JACOBS,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary,

Judge.


        Catherine Jacobs appeals the economic provisions of the decree dissolving

her marriage to Carl Jacobs.  **AFFIRMED AS MODIFIED.**


        John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant.

        Jeffrey T. Myers of Goosmann Law Firm, PLC, Sioux City, for appellee.


        Considered by Potterfield, P.J., Doyle, J., and Carr, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DOYLE, Judge.**

Catherine Jacobs appeals the economic provisions of the decree dissolving her 2013 marriage to Carl Jacobs. She also requests an award of her trial attorney fees.

We review dissolution proceedings de novo. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We examine the entire record and adjudicate the issues anew. *See id.* Although we are not bound by the district court's factual findings, we give them weight, especially if they concern witness credibility. *See id.*

**I. Property Division.**

Catherine first challenges the provisions of the decree concerning the division of the parties' property. Specifically, she argues the district court erred in determining Carl was entitled to reimbursement for sums he alleges he paid toward the down payment of homes she purchased in 2007 and 2016. She also argues the court should consider Carl's gambling losses in determining an equitable property division

The court dissolving a marriage must divide the parties' property equitably. *See* Iowa Code § 598.21(1) (2017). "The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). However, equitable does not necessarily mean equal, and what it is equitable must be determined on the circumstances of each case. *See id.* The factors set forth in Iowa Code section 598.21(5) guide the court in making an equitable division. Because the trial court has considerable latitude in determining what is equitable,

we will reverse only if "there has been a failure to do equity." *See In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005).

### A. Florida Property.

The first dispute concerns the Florida property, which Catherine purchased in 2007 when the parties were dating. The district court determined that the Florida home was not marital property and awarded it to Catherine. However, it found that Carl was entitled to reimbursement for $20,000 he contributed to the down payment and granted Carl an interest in the property in that amount. Catherine argues the evidence does not support the finding that Carl contributed any money toward the $42,000 down payment on the property.

Although it is undisputed that only Catherine's name appears on the deed and mortgage, the parties presented differing views on the details of the property's purchase. Carl testified that he and Catherine purchased the home "as a joint venture," but that because Catherine's credit score is better than his and they "saved a point" on the mortgage by putting it in Catherine's name alone. He claimed that he put $20,000 he made from the sale of a 1964 Chevy toward the down payment on the property. Carl conceded he has no proof or receipts concerning the $20,000. He testified:

> Q. Tell the Court how you made that deposit. A. I gave it to Catherine. On the Florida home?
> Q. Yes. A. Yeah. I just—I gave her the money.

Carl further testified that when he and Catherine separated in 2009, there was an agreement that he would get the $20,000 back if the home was sold.

Catherine denies that Carl contributed any money toward the purchase of the home, instead claiming that she provided the entire down payment. She

testified that the source of the funds was "a line of credit that I drew down on a condo that I owed free and clear so it was like a second mortgage."[1] She further explained that at the time, Carl was not in a position to be involved in the purchase of the home:

> [Carl] was going to get a job up there and the job didn't work out. And usually he sold a truck and that year he didn't sell the truck so he was actually pretty broke that year for the first time. He wasn't doing so well financially because the car didn't sell. He did eventually sell it in Lakeport, but he didn't sell it that year. And he did not give me any money whatsoever. And under oath, he did not give me any money towards that.

In resolving the issue of the down payment, the district court concluded,

> [R]econstructing what actually happened with regard to the purchase of this property when the parties were not married and given the difference in the parties' testimony and lack of documentation that directly addresses the down payment issue, the court concludes that Carl has proven by a preponderance that he is entitled to be reimbursed for his claimed contribution to the down payment, but he will be required to share the risk that the property will not sell for an amount that allows him to obtain a full return on his contribution.

The court decreed that if Catherine sold the property, Catherine would receive the first $22,500 from the net proceeds.[2] Then Carl would receive the next $20,000 from the remaining proceeds, with any remaining balance going to Catherine. The court further provided that if Carl's lien was not paid in full from the sale proceeds, he did not retain a lien in the sale proceeds and was required to release his lien against the property. Despite having concluded Carl should assume some of the risk that the property would not sell in an amount that would allow full

---

[1] Catherine provided documentation of a home equity line of credit she received in January 2007 for $60,000, but there is no indication that she used the line of credit in making a down payment on the property in question.

[2] We note that at the time of trial, the indebtedness and taxes against the property exceeded its appraised value.

reimbursement of his $20,000, the court, nevertheless, "put in place protections to provide for this reimbursement as matters may develop hereafter." The court tied Carl's reimbursement to his refinancing of the Sioux City property that the court ordered to take place within 180 days of entry of the decree. Specifically, the court decreed that at the time of the refinancing of the Sioux City property, Carl was to pay Catherine one-half of the equity after payment of loan costs and fees. From Catherine's one-half of the equity, Carl was to retain $20,000 for reimbursement for his contribution to the Florida property. Under this scheme, Carl does not share the risk the Florida property may not sell for enough to reimburse him the $20,000.

We do not believe it is fair to secure Carl's lien on the Florida property through the refinancing of the Sioux City property. Both parties should share the risk that the property will not sell for an amount that allows them to obtain a full return on their down-payment contributions. We therefore modify the language of the decree under the provision for **1260 Red Barn Road, Moore Haven, Florida** to read:

> This property is awarded to Catherine. Carl shall execute all documents necessary to convey his interest in the property to her pursuant to this decree. Carl retains a lien against this property for his down payment or contribution at the time of purchase in the amount of $20,000. If the Florida property is sold by Catherine, the division of the proceeds shall take place as follows. From the first $42,500 net proceeds of a sale (after deducting all mortgages (Ditech and Florida Hardest Hit), liens (other than Carl's), realtor commissions, taxes, closing fees, costs, and other sale-related expenses), Catherine shall receive 53% and Carl shall receive 47%.[3] Any remaining balance shall go to Catherine. In the event that Carl's lien is not paid in full, Carl does not retain a lien in the proceeds of the sale but will nevertheless release his lien against the real property and the proceeds without further recourse.

---

[3] Of the $42,500 down payment, Carl's contribution of $20,000 comprises 47% of the total, and Catherine's contribution of $22,500 comprises 53% of the total.

**B. Sioux City Property.**

The second dispute concerns a 2016 purchase of property in Sioux City. As with the Florida property, the Sioux City home and mortgage are in Catherine's name alone. The district court awarded the property to Carl with instructions to pay Catherine for one-half of the equity in the home. Catherine does not challenge the award of the home to Carl but instead challenges the court's finding concerning the down payment on the property. The court found:

> There was a down payment of $27,500 made by Carl. Carl testified that he sold a pre-marital asset ('66 Chevy Stepside) that provided the source of these funds for the down payment. Catherine on the other hand testified that she transferred these funds to him in order to allow him to make this payment and that he did not provide his own funds for this down payment. . . .
> The court . . . finds credible Carl's claim that he contributed to the down payment from the sale proceeds of his '66 Chevy Stepside noted above in the amount of $27,500 and should receive credit in the division of the net proceeds for this down payment amount.

Catherine claims that only $10,000 of that money came from Carl and approximately $17,500 came from her.

Carl testified that he provided the full $27,500 down payment on the Sioux City property. It is undisputed that Carl wrote a check for the $27,500 down payment from his bank account on April 14. Carl testified that he obtained the money for the down payment by selling a 1966 Chevy Stepside that he had purchased before the marriage and restored.[4]

---

[4] At one point in his testimony, Carl stated he sold the truck for $22,500. At another, he testified he sold the truck for $26,000.

Catherine testified that although the check for the down payment came from Carl's bank account, each party contributed funds for it. She testified that Carl wrote the check for the down payment to look like a gift to her, explaining:

> When I was working to get the mortgage—because it was on auction, it had to be quick. But underwriting would not approve the income I received from the Florida property as my tenant deposited it in cash. So when I talked with Roxanne at the bank, she said, well, there is one way we could do that. Have your husband write a check like it's a gift to you, and then we can say that you got the down payment, and underwriting would be okay with that.
>
> So I then transferred the money from my account—I believe we have an exhibit to show it, that I transferred the money into his account so he could write the check to show it to underwriting, and so the mortgage went through.

Bank statements show that Catherine transferred $27,500 from her Chase account (0228) to Carl's bank account on April 13, one day before he wrote the check for the down payment. Additionally, on March 30, 2016, Catherine and Carl signed a document stating:

> I, Carl L. Jacobs, . . . husband of Catherine Gavin (Jacobs) will give (or have given) a gift of $27,500.
>
> This is a bona fide gift and there is no obligation, expressed or implied, to repay this sum at any time. These funds are available and will be given (or have been given) to: Catherine Gavin/Jacobs in time to close the mortgage transaction on the purchase of his or her name.

Carl did not dispute that Catherine transferred $27,500 into his bank account one day before he provided the down payment. According to Carl, he deposited the money from the sale of the 1966 Chevy Stepside into Catherine's Bank of America account in Florida. He explained:

> I was going to put it in Chase, but Chase wouldn't accept it. So I had to go to Bank of America because I had an account at Bank of America also back then. Back then we both had accounts. And I put the money in Bank of America accounts. That's the best of my recollection. And it went to Bank of America to Chase—to her

account Chase, and then to my account and then I wrote the check out.

Catherine produced a deposit slip showing $9000 was deposited into Chase account 9071[5] and testified, "[T]he 9000 is the one he talked about and that was the deposit he made into my account in Florida." She also produced a check Carl wrote to her in the amount of $880 on April 11, which she testified was used for the down payment along with the $9000 deposit.

A bank statement for Chase account 0228 for the period of March 24, 2016, to April 25, 2016, shows the only transfer of money from a Bank of America account was a $3500 wire transfer on April 13. The statement also shows a transfer of $11,000 from Chase account 9071 into Chase account 0228 on April 11, which supports Catherine's testimony concerning the $9000 deposit and $880 check provided by Carl. Catherine then transferred $27,500 from Chase account 0228 to Carl's bank account on April 13, and Carl wrote a $27,500 check for the down payment on April 14.

Based on the above testimony and evidence, the trial court concluded and found credible Carl's claim that he contributed to the down payment from the sale proceeds of his '66 Chevy Stepside in the amount of $27,500. The court then decreed that upon Carl's refinancing of the property that Carl shall pay to Catherine one-half of the equity after payment of loan costs and fees or sales expenses if the property is sold. From Catherine's one-half of the equity, the court decreed Carl shall retain $27,500 which is reimbursement for his down payment. The court also

---

[5] Chase account 9071 is in the name of Alliance of Divine Love Chapel, a tax-exempt charitable organization that Catherine set up. No date is visible on the deposit slip contained in the electronic record.

provided that Carl was to retain $20,000 from Catherine's one-half equity as reimbursement for his contribution to the Florida property.

Upon our de novo review, we believe the evidence supports a finding that Carl contributed $10,000 toward the down payment on the Sioux City property rather than providing the full $27,500 down payment. We therefore modify the language of the decree under the provision for **2216 Jackson Street, Sioux City, Iowa** (as modified by the court's ruling on post decree motions) to read:

> This property is awarded to Carl, and Catherine shall execute all documents necessary to convey her interest in the property to him pursuant to this decree. Within 180 days following the entry of this decree, Carl shall seek and secure financing for this property that allows him to have Catherine removed as an obligor on any note and mortgage related to this property in exchange for her quitclaim deed of her interest in the property, which shall be provided no later than the closing on Carl's refinancing for this property. Until refinancing is completed as contemplated herein, Carl shall continue to pay the current mortgage on this property, keep the property insured as required by the lender, and pay any real estate or other taxes due on the property as they come due. At the time of refinancing, or sale if necessary, of the Sioux City property, using the value of the property as $150,000 and the debt against the property as $93,201, Carl shall pay over to Catherine one half of the equity after payment of loan costs and fees or sales expenses if the property is sold. From Catherine's one-half of the equity, Carl shall retain $10,000, which is reimbursement for his down payment on this property.

Any reference to reimbursement for Carl's contribution to the Florida real estate is removed.

### C. Dissipation of Assets.

Catherine next argues that gambling losses Carl incurred during the marriage wasted the marital assets. *See In re Marriage Kimbro*, 826 N.W.2d 696, 700 (Iowa 2007) ("A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution.").

Although she admits the exact amount of the losses has not been determined, she asks the court to consider it a factor in determining an equitable division of the property.

"The dissipation doctrine applies when a spouse's conduct *during the period of separation* 'results in the loss or disposal of property otherwise subject to division at the time of divorce.'" *Id.* at 700-01 (emphasis added) (citation omitted). Because Catherine's claim concerns gambling losses she says occurred during the marriage, we disagree that they amounted to a waste of marital assets and decline to consider them in the property distribution.[6]

**II. Trial Attorney Fees.**

Finally, Catherine argues the trial court erred in failing to award her trial attorney fees. We review the trial court's decision regarding the award of trial attorney fees for an abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). The decision to award attorney fees depends on the parties' respective abilities of to pay. *See id.* Considering these factors, we find no abuse of discretion in declining Catherine an award of her trial attorney fees.

**AFFIRMED AS MODIFIED.**

---

[6] Although we have found a party liable for marital assets dissipated during the marriage, the waste occurred without the other party's knowledge or consent. *See In re Mariage of Leininger,* No. 08-650, 2009 WL 2006233, at *1 (Iowa Ct. App. Mar. 11, 2009) (affirming award of dissipated assets where husband withdrew entire amount of wife's military salary while wife was deployed despite his assurances that he would save her earnings for a down payment on a home). Here, Catherine knew Carl gambled before they married and was aware of his gambling during the marriage. Carl testified that although Catherine knew he was gambling, she only complained about it at the end of the marriage.