**IN THE COURT OF APPEALS OF IOWA**

No. 18-1491
Filed July 24, 2019

**IN RE THE MARRIAGE OF DEORA LYNNE OLSEN
AND JAMES ALFRED OLSEN**

**Upon the Petition of
DEORA LYNNE OLSEN,**
        Petitioner-Appellee,

**And Concerning
JAMES ALFRED OLSEN,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Wapello County, Myron L. Gookin,

Judge.


        James Olsen appeals the district court's award of alimony to Deora Olsen.

**AFFIRMED.**


        Steven Gardner of Denefe, Gardner & Zingg, P.C., Ottumwa, for

appellant.

        Cynthia D. Hucks of Box & Box Attorneys at Law, Ottumwa, for appellee.


        Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

James Olsen appeals the decree dissolving his marriage to Deora Olsen, arguing the district court improperly calculated both his and Deora's incomes and improperly awarded Deora alimony of $300 per month for five years and then $250 per month for another five years. Deora requests appellate attorney fees.

## I. Background Facts & Proceedings.

James and Deora married on November 29, 1993. The two have one child, now an adult. Deora has one adult child from a previous marriage. The parties separated in November 2016, and the dissolution trial was held in June 2018. James and Deora were married for approximately twenty-four years.

At the time of the dissolution, James was fifty-seven. James owns and operates a tree trimming, maintenance, and removal business known as "Aubrey's Tree Maintenance," which he has done since before he and Deora were married. James has a problem with his right hip which causes him some pain and difficulties, but it does not impede his ability to work. At trial he described his health as "[f]airly good."

Deora was fifty-six at the time of the dissolution. She has a GED and is trained and licensed as a physical therapy assistant. She has been employed as a physical therapy assistant for around twenty-seven years with various companies. At her current position, she works thirty to forty hours per week, depending on patient demand. Thirty hours per week is considered full-time. She earns twenty-seven dollars per hour. She receives dental insurance through her employment but does not receive health insurance. Deora also regularly worked on-call at another healthcare provider from 2007 until early 2018. She

stopped working at the other healthcare provider because the company "got into some trouble and could not take any new patients." Deora also assisted James with his business by doing the bookkeeping, including preparing financial documents for tax preparation by their accountant. The record does not contain detailed information about Deora's health. The record does reflect that she broke her foot in 2015 and could not work most of that year, and that she has a condition called tumid lupus. No evidence was presented of the impact of tumid lupus on Deora's health or her ability to work, although she testified at trial it was a condition that required health insurance to manage properly.

The district court filed its findings of fact, conclusions of law, and decree of dissolution on August 16, 2018. In its determination of spousal support, the court first concluded it was necessary to take the average of the parties' income from 2014–17 because both parties had variable income over that period. The court determined Deora's average four-year income was $38,513 per year, based on her taxable wages and $10,816 in unemployment compensation she received in 2015 due to her broken foot. The district court next determined James's four-year average income to be $45,161. The district court calculated this figure by taking the average of his net income plus the depreciation he took on his federal income taxes from 2014–17. The court concluded the $45,161 figure more accurately reflected James's "minimum earnings capacity," rather than his actual income.

The district court awarded Deora alimony, based on James's larger income and the greater amount of debt Deora assumed in the dissolution.[1] The district court based the monthly alimony amount partially on the mortgage payments for the parties' home, which Deora received in the dissolution. The balance on the mortgage at the time of the dissolution was $8614, and the monthly service was $281.69. The court determined it was "reasonable to provide an alimony payment slightly in excess of the mortgage payment in the first five years and an alimony payment slightly less than the mortgage payment in the second five years" to account for of the amount of short-term debt—like credit card debt—Deora assumed.

James appeals the award of alimony.

## II. Standard of Review.

Trials of marriage dissolutions are equitable proceedings. Iowa Code § 598.3 (2016). We review equitable proceedings de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); Iowa R. App. P. 6.907. "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *McDermott*, 827 N.W.2d at 676. But "we will disturb a district court determination only when there has been a failure to do equity." *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

---

[1] Deora assumed $36,060 in liabilities from the dissolution; James assumed $7000. The district court also awarded James most of the parties' joint assets and ordered James to pay a property equalization payment of $25,980.50 to achieve equal equity between them. James does not appeal the division of assets and liabilities.

**III. Discussion.**

James makes two arguments. He argues awarding Deora alimony was inequitable in light of their similar earning capacities. He also argues the court erred in calculating both his and Deora's incomes. We address each argument in turn.

**a. Award of Alimony.**

James argues the district court erred by granting an award of any amount of alimony to Deora. To award alimony under Iowa Code section 598.21A(1), we consider the following factors:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
> i. The provisions of an antenuptial agreement.
> j. Other factors the court may determine to be relevant in an individual case.

We must examine all the factors in section 589.21(A)(1) when determining whether to award alimony. *Gust*, 858 N.W.2d at 408. The factors "cannot be considered in isolation from each other." *Id.* The most heavily weighted factors

are the length of the marriage and the earning capacities of the spouses. *Mauer*, 874 N.W.2d at 107. In assessing these factors, we recognize the trial court is "in the best position to balance the parties' needs, and we should intervene on appeal only where there is a failure to do equity." *Gust*, 858 N.W.2d at 416.

Applying these factors, we conclude the district court's award of alimony is equitable. The parties were married for over twenty-four years. "Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Id.* at 410–11. While they were married, Deora received her health insurance through James. She cannot receive health insurance through her work and now must pay for it herself. She has also assumed most of the parties' liabilities while James received most of parties' assets, some of which have retained considerable value over the time James took substantial depreciation deductions for them. In light of these facts, we see no inequity in the amount or duration of spousal support awarded to Deora.[2]

---

[2] We note that the amount and duration of alimony awarded by the district court is less than that which would have been awarded under the American Academy of Matrimonial Lawyers (AAML) formula for calculating spousal support. *See* Mary Kay Kisthardt, *Re-Thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance*, 21 J. Am. Acad. Matrim. Law. 61 app. A at 80–81 (2008). Applying the AAML formula using the district court's calculation of parties' annual incomes, Deora would receive alimony of $487.14 per month indefinitely. Applying the AAML formula and adjusting Deora's average income as we have done here, Deora would recieve alimony of $400.56 per month indefinitely. We are not obligated, however, to increase the alimony award based on the AAML guidelines. *Gust*, 858 N.W.2d at 416 n.2 ("While clearly not binding on an Iowa court, the AAML guidelines nonetheless provide a useful reality check with respect to an award of traditional spousal support."). Nor does Deora request more alimony on appeal.

**b. Calculation of Income.**

James also argues the district court improperly calculated Deora's 2014–17 income by including 2015 in the average. This was error, he argues, because she was injured and unable to work for most of the year and received unemployment compensation at a rate less than her customary compensation during that year. James argues the district court should have instead taken an average of Deora's income from only 2014, 2016, and 2017. On our de novo review, we agree. When we consider awarding alimony, "we focus on the earning capability of the spouses, not necessarily on actual income." *In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015). Deora's broken foot in 2015 did not stop her from working full-time in 2016 and 2017, and the record does not suggest it will reduce her earning capacity going forward. We conclude the proper average of Deora's income is an average of her income in the years 2014, 2016, and 2017, which calculates to $43,708 annually. While we agree with James that an average of Deora's income for 2014, 2016 and 2017 is higher than the amount computed by the district court, we find that the amount of alimony ordered serves the intended purpose and is equitable.

James further argues the district court improperly calculated his earning capacity by adding the amount of depreciation he claimed on the equipment used in his tree business to his available income. He contends the district court should have taken an average of his net profit over 2014–17 and not add the depreciation he claimed in each of those years to his income. While we agree there may have been a more finely tuned approach to determining James's

income, we, like the district court, do not have the benefit of evidence on which to calculate an appropriate amount of depreciation to deduct from taxable income.

The Iowa Supreme Court has addressed depreciation in the context of child support computations:

> Depreciation is a mere book figure which does not either reduce the actual dollar income of the defendant or involve an actual cash expenditure when taken. On the contrary, it represents additional cash available to the defendant by permitting substantial tax deductions and, ultimately, tax savings. The fact that the defendant may use some or all of the cash represented by depreciation to pay off principal indebtedness on the property is of no consequence since such payments, in effect, increase his net worth and estate by increasing his equity.

*In re Marriage of Gaer*, 476 N.W.2d 324, 328 (Iowa 1991) (quoting *Stoner v. Stoner*, 307 A.2d 146, 151 (Conn. 1972)). In *Gaer*, the court adopted a flexible approach to assessing depreciation:

> In formulating a workable and flexible approach . . . we hold that the amount of depreciation, if any, to be considered in determining the availability of net income for the purposes of alimony and support awards is best left to the court's discretion "determined from all the circumstances including the amount of depreciation claimed and the property depreciated."

476 N.W.2d at 328 (quoting *Stoner*, 307 A.2d at 151). To fairly account for depreciation, we recalculate depreciation under the straight-line method of depreciation.[3] *McDermott*, 827 N.W.2d at 685. But no depreciation will be deducted from a party's income where the asset depreciated is "a hobby or a tax shelter." *In re Marriage of Starcevic*, 522 N.W.2d 855, 857 (Iowa Ct. App. 1994). We have applied the principles from the *Gaer* line of cases to alimony disputes

---

[3] Straight line depreciation each year = (Cost of asset − salvage value)/Serviceable lifetime.

before. *See, e.g.*, *In re Marriage of Jenks*, No. 01-0018, 2002 WL 575574, at *2 (Iowa Ct. App. Mar. 13, 2002).

Between 2014 and 2017, James claimed $67,233 in depreciation deductions on a variety of assets he used in the course of operating Aubrey's Tree Maintenance. That the assets were used solely for business-related activities is not disputed. The district court calculated James's income by adding the total depreciation deducted between 2014 and 2017 to his net income over that same period, for a total income of $180,642 and an average income of $45,161 per year. While our case law suggests we should recalculate James's depreciation under the straight-line method and deduct that amount from his net profit, the record does not permit us to do so. The first step to calculate an asset's depreciation under the straight-line method is to deduct the salvage value from the asset's basis. James claims each of the assets for which he took depreciation deductions in 2014 and 2015 had a salvage value of $0. When he submitted valuations for these assets to the district court, however, he valued many assets considerably more than $0.[4] Without evidence providing accurate salvage values for the depreciated assets, we, like the district court, are unable to accurately determine the amount of depreciation to deduct from James's net profit under the straight-line method. We affirm the district court's calculation of James's income. Furthermore, it was reasonable for the district court to

---

[4] For instance, James claimed the useful life of his clam truck was five years on all of his tax returns from 2014 to 2017. The truck was placed in service in July 2013, and the five-year useful life had run at the time of trial. Despite claiming it had a salvage value of $0, he valued the clam truck at $25,000 at the time of trial. The district court adopted James's valuation of all the couple's business-related assets, citing his "significant expertise in the value of such equipment."

conclude the average income calculated reflected James's minimum earning capacity rather than his actual earnings. James testified at trial that he was unable to invest in his business since he and Deora separated, due to expenses related to this litigation. Despite bearing these additional costs, James's net business profit has increased substantially since he began filing individual tax returns in 2016, even when depreciation deductions are entirely excluded from his net profit.[5]

### c. Attorney Fees.

Finally, Deora argues we should award her attorney fees and costs on appeal, in the amount of $2500. "Appellate attorney fees are not a matter of right but rather rest in this court's discretion." *McDermott*, 827 N.W.2d at 687 (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)). "In determining whether to award appellate attorney fees, we consider 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (quoting *Okland*, 699 N.W.2d at 270). After carefully considering each of the factors, we decline to grant appellate attorney fees. Costs shall be taxed equally to both parties.

**AFFIRMED.**

---

[5] Excluding depreciation deductions, James reported a net profit of $24,352.00 for 2014 and 2015 collectively. He reported a net profit of $89,057.00 for 2016 and 2017 collectively.